247 S.W.2d 325 (1952)
STONE
v.
REED et al.
Nos. 28380-28383.
St. Louis Court of Appeals. Missouri.
March 18, 1952.
Rehearing Denied April 18, 1952.
*327 John F. Hanlon, St. Louis, for Estel Corneil Reed.
George A. Hodgman, Wm. J. McCluggage, St. Louis, for Roadway Express, Inc.
William J. Becker, Erwin Tzinberg, Clayton, Mo., for respondent.
ANDERSON, Judge.
This is an action by Alfred J. Stone, as plaintiff, against defendants, Estel Corneil Reed and Roadway Express, Inc., to recover damages for personal injuries alleged to have been sustained on August 14, 1949, as the result of a collision at the intersection of Newstead Avenue and Page Boulevard in the City of St. Louis between an automobile driven by plaintiff and a tractor owned by defendant Roadway Express, Inc., and operated by defendant Reed. There was a verdict and judgment for $4,000 in favor of plaintiff against both defendants. Defendants have appealed.
The case was submitted to the jury on the the theory of primary negligence on the part of the driver of said tractor, said specification being that said defendant Reed operated said tractor (1) at a high, excessive and dangerous rate of speed under the circumstances, so as to endanger the life and property of the plaintiff; and (2) that defendant Reed negligently and carelessly failed to stop said tractor "at the boulevard stop sign for eastbound traffic along Page Boulevard at Newstead Avenue * * *."
Defendant Reed was an employee of defendant Roadway Express, Inc., and recovery against the latter was sought under the doctrine of respondeat superior.
The first point urged by appellants is that their respective motions for a directed verdict should have been sustained on the ground that plaintiff was guilty of contributory negligence as a matter of law.
The accident occurred at about 11:15 p. m. on Sunday, August 14, 1949, within the intersection of Newstead Avenue and Page Boulevard. At the trial, the parties stipulated that "Page Boulevard was, on August 14, 1949, an open public street in the City of St. Louis, Missouri, running east and west, and that Newstead Avenue was, on said date, an open public street in the City of St. Louis, Missouri, running north and south; that automobile traffic moving eastwardly on Page Boulevard was required, under the ordinances of said city, in full force on said date, to make a full stop at the west line of Newstead Avenue before proceeding eastwardly into the intersection of Page Boulevard and Newstead Avenue, and that by virtue of said ordinances there was, on said date, an octagonal sign, painted orange color, facing west on the south side of Page Boulevard, in plain view of eastbound traffic, containing the word `STOP' in black letters; that automobile traffic moving southwardly on Newstead Avenue was required, under the ordinances of said city, in full force and effect on said date, to make a full stop at the north line of Page Boulevard before proceeding southwardly into the intersection of Newstead Avenue and Page Boulevard and that by virtue of said ordinances there was, on said date, an octagonal sign, painted orange color, facing north on the west side of Newstead Avenue, in plain view of southbound traffic, containing the word `STOP' in black letters."
Newstead Avenue has three traffic lanes, and Page Boulevard has six traffic lanes. At the time of the accident plaintiff was, and had been for several blocks, proceeding southwardly on Newstead Avenue, and defendant Reed was, and had been, proceeding east on Page Boulevard. Plaintiff was driving a Chevrolet automobile and riding with him was a friend, Mrs. Lillian Wilson. Defendant Reed was operating a White tractor truck, and with him was a friend, Kenneth Smithee.
Plaintiff testified as he approached Page Boulevard he decreased the speed of his car and came to a complete stop at the intersection. At that time plaintiff's car was in the traffic lane adjacent to the center line of the street. Plaintiff stated that when he stopped he had an unobstructed view west on Page Boulevard and observed the tractor of defendant Reed approaching the intersection from the west, four hundred or five hundred feet from said intersecting street.
*328 Plaintiff testified: "There wasn't a lot of traffic on the street. I noticed this light coming, I would say close to four or five hundred feet. I could see him coming. I knew he was coming pretty fast and I wasn't going to drive out there at the rate he was coming and drive into him * *. I don't think I saw any other car there; could have been. I was watching this one on the inside."
Plaintiff further testified that when he stopped at the curb line the front wheels of his car were about fifty-five feet from the center of Page Boulevard. When first interrogated with reference to the speed of defendant's tractor as it approached the intersection, plaintiff declined to give an estimate, but stated:
"He was right in the middle of the street, coming on down at a good clip. I didn't try to estimate the speed, but I know it was a good speed because he bore down on us awful fast. * * * No, I wouldn't say that I could estimate a car coming from me or towards me, four or five hundred feet away. * * * I don't think I could. * * * I looked principally all the time at this car coming toward me because I saw the light coming, I saw it was approaching at a fast gait of speed; I knew it was traveling fast, I knew that. * * * I couldn't answer the speed of it but I could say it was traveling fast. * * * Well, in my estimation, he was traveling about 35 or 40 miles an hour; that is about what I thought he was traveling, but that would be a guess.

* * * * * *
"Q. You estimated, before you ever entered the intersection, you estimated he was going 35 or 40 miles an hour, is that correct? A. I would say, yes."
Plaintiff testified that after seeing the tractor approaching he drove into the intersection and proceeded across same very slowly, at a speed not over six miles an hour; and that when he reached a point about one-fourth of the way across Page Boulevard, or about twenty-five feet from the north curb of Page Boulevard, he observed the tractor about 200 feet from his car. Plaintiff testified:
"Q. And at that moment, sir, when you were about half way into that half of Page Avenue, approximately how far from your car was this other vehicle? A. He must have been down to about 200 feet.
"Q. He was about 200 feet from you at that time? A. Yes.

* * * * * *
"Q. Could you tell us whether you observed that it was going faster or slower than when you first observed him some four to five hundred feet away from you? A. He hadn't slowed down any. * * * He was going about the same speed, I would think. * * * On the very inside lane.

* * * * * * *
"Q. When you observed that he was about 200 feet from you and you say he was still coming at that same fast rate of speed, what did you do with your car? You're half way out into that half of Page Avenue. A. Kept going slow until I saw that I didn't think he was going to stop, and I stopped.
"Q. How far from the intersection was this other vehicle when you concluded that he wasn't going to stop? A. Well, he bore down there and got close. When I told you a while ago 200 feet, it didn't look to me like he had any intention to stop.
"Q. At that moment, when he was 200 feet away, and your automobile was half way into Page Avenue, you concluded that he had no intention of stopping? A. I certainly did.

* * * * * *
"Q. Now, Mr. Stone, under the circumstances prevailing that night, the weather as it was, the pavement and the conditions you have testified to, and the speed you were traveling, six miles an hour, within what distance could you safely bring your automobile to a stop? A. I could stop it within a foot."
Plaintiff further testified that he thereafter proceeded across the intersection and when he reached the center line of Page Boulevard applied the brake on his car. He stated, "Well, I was right on the line and I stopped right there, on the spot." Plaintiff further testified that defendant Reed *329 did not bring his tractor to a stop at any time before the collision; that he (Reed) did not slow down or swerve in either direction "until he saw me, when he was right on me, he swerved and throwed his rear wheels in next to me and caught me. * * I was standing there more or less praying than anything else. * * * I stopped when I saw he wasn't going to make the stop * * * and I was standing dead still when he hit me.
"Q. At the moment of impact, where were your front wheels with respect to the center line of Page Avenue? A. I was just a little over the line.
"Q. Just a little south of the center line? A. My car rolled over, maybe my wheels was a foot over the line. * * * my bumper would be about two or three feet from the front wheels."
Plaintiff further testified that at the moment of impact the left front wheel of his car was about two feet from the center line of Newstead and that the tractor was "right along the center line of Page" with the front wheels "I would say three or four feet from the center line of Newstead. * * * I had the wheels cut as much as I could when I stopped * * * cut so that when he hit me I drove with the car * * *. They were cut to the left * * but not very much. I didn't have time to do a lot of cutting. I drew them to the left.
"Q. Was there any impediment whatever to your swerving to the right so as to have gone to the rear of this tractor? A. No. My idea was to stop and just stand still, that was my idea, and let him go. I just stood there."
Plaintiff further testified that there was no traffic to the rear of the tractor except "maybe a block away." Plaintiff at no time sounded the horn on his car as he proceeded across the intersection.
The contention that plaintiff was guilty of contributory negligence as a matter of law is based upon the claim that after he knew that defendant Reed was not going to stop at the intersection he had ample opportunity to avert the collision by stopping his car before it entered the path of the on-coming tractor, or that he could have sounded a warning so that defendant Reed, becoming aware of plaintiff's presence, could have passed safely in front of him.
In order to justify a conclusion that plaintiff was guilty of contributory negligence as a matter of law, the evidence must be such as to require a finding that all reasonable men in the exercise of an honest and impartial judgment must draw the conclusion under the facts that plaintiff did not exercise the highest degree of care. Fortner v. St. Louis Public Service Co., Mo.Sup., 244 S.W.2d 10; Gratiot v. Missouri Pacific R. Co., 116 Mo. 450, 21 S.W. 1094; Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S.W.2d 58.
We are frank to say that the question presented is a close one on the facts. Under the evidence, it appears that plaintiff's car arrived at the intersection when defendant's tractor was 400 or 500 feet west of Newstead Avenue. At that time, plaintiff had the right to assume that he was entitled to the crossing first, and that the driver of defendant's tractor would perform his duty and observe the "stop" sign at the intersection. Plaintiff also had the right to assume that even though Reed was exceeding the speed limit, and violating the law which required him to operate his tractor as near the right-hand curb as practicable, he would slacken the speed of his tractor or change its direction so as to avoid colliding with plaintiff's car. Acting on those assumptions, plaintiff cannot be said to be guilty of contributory negligence in entering the intersection. The evidence further shows that plaintiff thereafter proceeded to cross the street in a very cautious manner. The speed of his car as he made the crossing was not in excess of six miles per hour, and during the whole time he continued to watch the on-coming tractor. When plaintiff reached a point about twenty-five feet from the center line of Page Boulevard he became aware that Reed was not going to make the boulevard stop before entering the intersection. At that point plaintiff came under a duty to take steps to avert a collision; to take precautions commensurate with the dangers to be reasonably anticipated under the circumstances. However, in performing *330 that duty, no reasonable person would expect plaintiff to exercise the cool and accurate judgment of one sitting at a desk with pad and pencil figuring the possibilities based upon distances and rates of speed of the two vehicles in question. Plaintiff was, through the negligence of defendant Reed, put in position of danger, and we cannot adjudge plaintiff guilty of contributory negligence as a matter of law merely because he did not use the very best judgment under the circumstances. Plaintiff had scant time to deliberate, and his knowledge of the speed of the truck was none too accurate or clear, which fact could be said to furnish an excuse for his failure to sooner apply the brakes. At least, a reasonable mind could so find. His failure to sound the horn could be excused on the ground that his car was in plain sight and had been for some time. It is also anticipated dangers such as confronted plaintiff that a person must guard against. And, in this connection, could it be said that all reasonable men would deny plaintiff the right to assume that the driver of the tractor, having the whole of the south side of Page Boulevard within which to maneuver his tractor, would not change its direction so as to avoid striking plaintiff's car? We think not. We hold that reasonable minds might reach different conclusions as to whether plaintiff was negligent under the evidence, and therefore the question was one of fact for the jury.
Appellant Roadway Express, Inc., contends that it is entitled to an outright reversal of the judgment as to it for the reason that defendant Reed was not at the time of the collision acting for Roadway Express, Inc., in any capacity.
Plaintiff's evidence showed that the words "Roadway Express, Inc.," were painted on the door of the tractor, and that Reed, at the scene of the accident, stated that the tractor belonged to defendant Roadway Express, Inc. Reed also told plaintiff and the police officers at the scene of the accident that he was employed by Roadway Express, Inc.
Upon the introduction of the foregoing evidence there arose a presumption that Reed was, at the time in question, acting within the scope of his employment. Guthrie v. Holmes, 272 Mo. 215, 198 S.W. 854; Kinkead v. Management & Engineering Corporation, Mo.App., 103 S.W.2d 545; State ex rel. Steinbruegge v. Hostetter, 342 Mo. 341, 115 S.W.2d 802. However, since the foregoing presumption was a procedural one, it took flight upon the appearance of substantial evidence tending to show the facts, and the issue must then be determined on the facts in evidence. State ex rel. Steinbruegge v. Hostetter, 342 Mo. 341, 115 S.W.2d 802. It therefore becomes necessary to examine the evidence adduced by defendants on this issue.
It appears from the defendants' evidence that the tractor in question was owned by Al. Young of Lawton, Oklahoma, and was in the possession of defendant Roadway Express, Inc., under a lease dated July 3, 1948. Defendant Reed had been in the employ of Roadway Express, Inc., for about two and one-half months prior to the accident.
Reed, driving said tractor with trailer attached, left Indianapolis, Indiana, for Kansas City, Missouri, at about 9:00 p. m. on August 13, 1949, and arrived in St. Louis between 4:00 and 5:00 a. m., August 14, 1949. Upon arrival in St. Louis, Reed stopped at Frank's Service Station located at 626 South Broadway. Frank's Service Station is a gathering place for men who are on trips across the country. The service station has a parking lot where tractors and trailers can be parked. Reed stated he was a regular customer. Reed further testified that he had been on the road between seven and eight hours and, under the law, was required to rest at least eight hours. He said he intended to continue his journey that night.
Reed remained at the service station the "biggest part of the day," during which time he slept in the cab of the tractor. About eight or nine o'clock that evening Reed detached the tractor from the trailer and drove to Bernard's Steak House, an eating establishment located at 7100 Page Boulevard, about eight miles distant from Frank's Service Station. He was accompanied by a friend named Kenneth Smithee. *331 Reed and his friend ate their evening meal at Bernard's Steak House. They were there about two hours, and were returning to Frank's Service Station at the time the accident occurred. After being released by the police, Reed returned to Frank's Service Station, picked up the trailer and proceeded toward Kansas City. He spent the night near Wentzville, Missouri, pulling his tractor alongside the road for that purpose. He arrived in Kansas City the evening of August 15.
For his services Reed was paid a percentage of the gross revenues collected for transporting the goods in said trailer. He received, in advance, checks from Roadway Express, Inc., for gas, oil, and repairs.
Reed further testified:
"Q. Is there any restrictions placed upon you by your employer as to where or how close or what vicinity of your trailer load you must take your food, or eat? A. No, sir.
"Q. Is there any restriction placed upon you by your employer as to how you will go to and from your place of eating on these journeys? A. No, sir.
"Q. Are you free to use the tractor to go to eat while your are on the journey? A. I thought we was.

* * * * * *
"Q. When yeu left to eat, did you have any determination in your mind as to how soon you would leave St. Louis with your load? A. As soon as I got back from eating, no certain time.
"Q. So that the matter of sleeping at Frank's Service Station, going out to eat and coming back to your trailer, was part of your regular layover on a continuous trip from Indianapolis to Kansas City, Missouri? A. Yes, sir.

* * * * * *
"Q. On those trips that you had made previous to the date of the accident, had you used the tractor alone to go to and from your places of eating on your layover period? A. Before that? Yes.
"Q. Had you observed or of your own personal knowledge knew of drivers who so used the tractors to go to and from their eating places on their trips? A. Yes.
"Q. That was only while they were on a trip, not after or before a trip, that was during the trip, at your layover periods? A. No, it was at the end of the trip, a lot of them do it.

* * * * * *
"Q. Are you in any way restricted or were you in any way restricted by orders or instructions from Roadway as to where you would eat? A. No, sir.
"Q. You had the right to make your choice? A. Yes, sir."
Reed further testified that on previous occasions when he had made trips through St. Louis he stopped and unhooked his trailer at the loading dock of Roadway Express, Inc. He further testified:
"Q. And when you would do that, would you drive away in the tractor? A. Yes, sir.
"Q. To eat and sleep? A. Yes, sir.

* * * * * *
"Q. From the time you reached St. Louis, at four or five o'clock in the morning on Sunday, until you hooked up your trailer, after the accident, Sunday evening, to go to Kansas City, did you do anything for the Roadway Express Company of any kind? A. No, sir.

* * * * * *
"Q. And were you on your own time during the time you were in St. Louis. A. Yes, sir."
The test to be applied in determining whether an employer can be held liable for an employee's tortious act is, not whether said act was done during the term of employment, but whether it was committed in the prosecution of the employer's business. If at said time the employee has departed from his work to accomplish some purpose of his own, not connected with his employment, the relation of employer and employee is thereby temporarily suspended and the master is not liable for his employee's acts during the period of suspension; and this is so even though in prosecuting his private mission the employee makes use of the employer's motor vehicle *332 with the latter's consent. Daily v. Maxwell, 152 Mo.App. 415, 133 S.W. 351. Beyond the scope of his employment, an employee is as much a stranger to his employer as any third person.
In the case at bar, Reed was employed to transport freight from Indianapolis, Indiana, to Kansas City, Missouri. This freight was loaded into a trailer which was pulled by a tractor, and during the time that Reed operated this tractor with the trailer attached he was engaged in the furtherance of his employer's business. However, at the time of the accident, Reed was not engaged in transporting this cargo of freight to its destination, but was using the tractor for the purpose of conveying himself and friend from an eating establishment located several miles distant from Frank's Service Station, the place where he left said trailer. The trip in question was made during a lay-over period which was required by law, and when Reed had no specific task to perform in behalf of his employer. Reed actually performed no service for his employer and considered himself off duty during said time.
Reed had no express authority from his employer to use the tractor for his own private purposes, and there is nothing in the evidence to warrant an inference that he had implied authority so to do. There was no evidence that anyone of authority in said company knew that the tractor had previously been put to private use, and the character of the vehicle was such that it could hardly be said to have been in the contemplation of the parties that it might be so used. Under the contract of employment Reed was to furnish his own meals.
Do the facts warrant an inference that Reed's use of the tractor in driving to Bernard's Steak House was to facilitate his labor and service, thus bringing it within the course and scope of his employment? We are of the opinion that the facts of the case do not permit this inference. This is not a case where one, engaged in the pursuit of the master's business, deviates from the strict course of duty to attend to necessary, usual or incidental personal wants, the pursuit of the master's business continuing to be the controlling purpose of the trip. Reed was not performing his duties, that is, hauling freight at the time of the accident. His duties in that regard had been suspended several hours before he left with his friend to go to Bernard's Steak House. He had abandoned his employer's service and, for the time being, was strictly on a mission of his own.
The general rule is that the relation of master and servant is suspended while the servant is going to and from meals, even though he is driving the master's car at the time, unless there is some special direct benefit to the master from the use of said car. In Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 5, Sec. 3042, we find the rule stated as follows: "* * * the relation of master and servant must ordinarily be deemed suspended while he is going to and from his meals, particularly where the servant is to board himself, and, the master is not liable for the servant's negligence while so traveling to and from meals, although the servant is driving the master's machine."
In Berry's Law of Automobiles (7th Ed.), Vol. 4, Sec. 4.377, p. 649, the general rule is stated as follows: "Even if the employer gives his permission to the use of his automobile by an employee to go to lunch, such use being in no way connected with the business of the employer, he is not liable for the acts of the employee at such time." See also, Huddy's Cyclopedia of Automobile Law, Vol. 7-8, Sec. 100, page 265; Corpus Juris, Vol. 42, sec. 868, page 1108; 60 C.J. S., Motor Vehicles, § 437; Steffen v. McNaughton, 142 Wis. 49, 124 N.W. 1016, 26 L.R.A.,N.S., 382; Calhoon v. D. C. & E. Mining Co., 202 Mo.App. 564, 209 S.W. 318; Halsey v. Metz, Mo.App., 93 S.W.2d 41.
In Calhoon v. D. C. & E. Mining Co., supra [202 Mo.App. 564, 209 S.W. 321], it appears that the mining company's superintendent had loaned defendant Nolan a car belonging to the mining company to use in going to his home for meals. Held that the mining company was not liable to one injured through the negligent operation of *333 the car when so used by Nolan. The court said: "When defendant Nolan was going to his home for his supper he was then on a mission of his own business, a matter that proximately concerned Nolan only. The contract of employment did not require the mining company to furnish Nolan transportation to and from his meals, and it was a mere accommodation to Nolan to loan him the car to go to and from his meals while his own car was out of order. Had Nolan been in his own car at the time of the collision, it could hardly be urged that the defendant mining company would be liable, yet there was no different relation created when Nolan's car broke down, and the mining company loaned him its car to use in going to his meals until his own car was repaired."
Respondent, however, contends that in the case at bar the use of the tractor by Reed was calculated to and did facilitate his labor and service in that by obtaining food and rest he was rendered more alert while actually engaged in driving the tractor and trailer, with the result that the equipment and cargo would be less subject to loss or destruction than it would be had he not done so; that the employer was benefited to that extent, and therefore Reed was, at the time in question, acting within the scope of his employment.
Such benefit as would accrue to defendane Roadway Express, Inc., from Reed's resting and taking nourishment during his free time would be an indirect benefit common to all general employments. To hold that it was a legal benefit to the employer, so as to widen the scope of the employment, would be placing an undue burden on industry, and an unwise extension of the vicarious liability of the master for torts of his servant. Gewanski v. Ellsworth, 166 Wis. 250, 164 N.W. 996; Marion Trucking Co. v. Byers, Ind.App., 97 N.E.2d 635.
In our opinion, plaintiff failed to make a case against defendant Roadway Express, Inc., for the reason that he failed to show: (1) that the use of the tractor by Reed at the time in question was with the knowledge and consent of Roadway Express, Inc.; and (2) that Reed at the time of the accident was employed in furtherance of his master's business. This conclusion renders it unnecessary to consider further assignments of error advanced by appellant Roadway Express, Inc.
The judgment appealed from is affirmed as to appellant Estel Corneil Reed, and reversed as to appellant Roadway Express, Inc.
BENNICK, P. J., and HOLMAN, J., concur.