Lionel R. **WELLMAN** and Bettie **Wellman** (Plaintiffs) Respondents,

v.

**PACER OIL COMPANY** (Defendant) Appellant.

No. 56672.

Supreme Court of Missouri, En Banc.

Dec. 10, 1973.

Rehearing Denied Jan. 14, 1974.

Roger W. Penner, Joseph B. Bott, Meyer, Smith, Bott & Penner, Kansas City, for respondents.

John M. Kilroy, Fred Wilkins, Shughart, Thomson & Kilroy, Kansas City, for appellant.

---

HOLMAN, Judge.

This action arose out of an occurrence at a service station operated by defendant Pacer Oil Company when Allen Gamble, a station employee, shot Lionel Wellman (hereinafter sometimes referred to in the singular as plaintiff) inflicting serious injuries. Lionel filed suit against Gamble, Pacer, and Ben Clarke, the station manager, to recover for his injuries, and his wife Bettie joined in seeking a recovery for loss of services. Both plaintiffs also sought a judgment for punitive damages. Gamble defaulted and, at the conclusion of the evidence, the court directed a verdict for Clarke. The jury returned a verdict for Lionel against Pacer in the amount of $42,000 actual and $18,000 punitive damages, and in favor of Bettie in the amount of $2,500 actual and $2,500 punitive damages. The judgment is final as to Gamble. Pacer Oil Company (hereinafter referred to as defendant) has duly appealed. The notice of appeal having been filed prior to January 1, 1972, we have jurisdiction because of the amount in dispute. This case was first heard and submitted in Division One, but was thereafter transferred to Court en Banc by that division without the adoption of an opinion.

On July 2, 1967, plaintiff was a noncommissioned officer at Richards Gebaur Air Force Base located near Kansas City. Plaintiff testified that late in the afternoon of that day he took his family to a Kansas City park for a cookout; that during the process of cooking the food he drank four or five cans of beer; that they returned home at about 9:30 and he and his wife then went to visit her mother; that at about 10:30 p. m., he stopped at the service station at 18th and Paseo to obtain gasoline; that the attendant, Allen Gamble, serviced his car, including checking the oil; that he acted surly but did everything he asked him to do; that they left the station and about two blocks away the hood on his car "flew up"; that he couldn't get the hood to stay fastened so he tied it down and went back to the station so he could advise the attendant that he had damaged his hood; that his car was a 1961 Falcon which had been driven 70,000 miles.

Plaintiff further testified that when he returned to the station there were a number of cars waiting to be serviced; that he waited for a time and then went over to Gamble who was servicing another car and accused him of "messing up" the hood on his car and asked him to look at it and see if he he could fix it; that Gamble denied damaging the car and became belligerent; that he pursued the matter for about two minutes, and determined that Gamble was not going to do anything and that he should "leave and come back tomorrow and see the manager"; that as he turned he heard his wife scream, "Don't shoot my husband"; that he did not recall a shot being fired then, but realized that he was stunned and dazed; that he crawled around the front of his car and got in the driver's seat; that he then felt his temple and there was blood on his hand; that as he sat there trying to clear his head Gamble opened the door and shot him in the right leg; that just before the shot he had heard Gamble mumble, "I'll take care of this right now"; that he managed to get the car started, and started to drive to General Hospital but was stopped by a policeman who obtained an ambulance and he was taken to the hospital.

Mrs. Wellman testified that after her husband started talking with Gamble she saw that Gamble was getting "ruffled" and

that she got out of the car intending to tell her husband to "come on and let's go"; that after she got out she saw her husband turn to leave Gamble, at which time Gamble pulled a gun; that she then screamed, "Don't shoot my husband" and that Gamble turned and fired a shot at him and her husband fell; that after her husband got back into the car Gamble approached and said, "I am going to settle this right now"; that Gamble then fired a shot into the car; that her husband then left in the car; that a policeman came up and took the gun from Gamble and took her to where their car was stopped at a stop light about a block away; that she then went with her husband in the ambulance to the hospital.

Another eyewitness, Mr. Pettijohn, was seated in his car waiting for service. His testimony was about like that of the plaintiff, except he said that after the two men had argued for a time plaintiff stepped forward towards Gamble, at which time Gamble stepped back and pulled his gun and told plaintiff he was going to shoot him.

Another witness was Galen Hemmering, a Kansas City police officer, who was driving by in his car when he saw the argument between the two men. He stated that plaintiff put his hands up and shoved Gamble back "like he was fending someone off, and at that time I saw a pistol in the right hand of Mr. Gamble"; that he then pulled his car into the station; that as he left his car and was approaching plaintiff's car he saw Gamble open the car door and shoot plaintiff; that he took the pistol away from Gamble and then followed plaintiff's car a short distance to where it had stopped; that he radioed for an ambulance and had plaintiff taken to General Hospital.

Plaintiff received serious and permanent injuries to his leg which will not be detailed here because not material upon this appeal.

Plaintiff read certain admissions filed by James Rush, Vice President of Pacer Oil Company, and from the deposition of Clarke, the station manager. From these admissions it appears that Gamble was working the 10 p. m. to 8 a. m. shift that night; that he had no supervisor and thus was in charge of the station; that it would be his duty to hear complaints, although not necessarily to adjust them; that it was the duty of Clarke, the manager, to hire and discharge employees; that Gamble was permitted to work about eight days after the shooting and was then discharged because of the shooting and for other reasons; that the employees of Pacer were not given any instructions one way or the other concerning the carrying of weapons during the time they were on duty.

There was no evidence that Clarke or anyone connected with defendant Pacer had any knowledge that Gamble carried a gun. There was also no evidence to indicate that Pacer knew or had reason to believe that Gamble was a person of violent tendencies at any time prior to the occurrence in question.

No evidence was offered by defendant.

The sole question presented upon this appeal is whether the trial court erred in overruling the motion of defendant for a directed verdict and its after-trial motion for judgment. It is the contention of defendant that no submissible case was made against it because Gamble's acts in shooting plaintiff were not within the scope and course of his employment. Obviously, if defendant is to be held responsible for the acts of Gamble on the occasion in question, it must result from the application of the principle of respondeat superior.

Many of the cases cited and discussed in the briefs deal with the question as to whether the business of the employer had been completed before the assault occurred and that, for that and other reasons, the assault was not inflicted with an intent to promote the business of the employer but was motivated by purely personal reasons of the employee, such as gratifying feelings of anger or resentment. We will

not further pursue those questions because we have decided that this case should be ruled upon a theory or principle that has not heretofore been expressly applied in this state.

We have concluded that the actions of Gamble were so outrageous and criminal —so excessively violent as to be totally without reason or responsibility—and hence must be said, as a matter of law, not to be within the scope of his employment. In support of that ruling we approve certain statements in Restatement of Agency 2d, § 231, Comment a, as follows:

"The fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result. The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do.

"A chauffeur, driving on an errand for his master, who knowingly drives on the left-hand side of the street or exceeds the speed limit, is still acting within the scope of employment. Likewise, a gardener using a small stick in an assault upon a trespassing child to exclude him from the premises may be found to be acting within the scope of the employment; if, however, the gardener were to shoot the child for the same purpose, it would be difficult to find the act within the scope of employment. So, if a servant is directed to use any lawful means to overcome competition, the bribery of employees of the competitor or the circulation of malicious stories, might be found to be within the scope of employment, while the murder of the competitor, although actuated solely by zeal for the master, would not be."

Also, in § 235, in Comment c, it is said:

"*Outrageous acts.* The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. * * * In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm. Hence, unless the principal has violated a personal duty to the person injured, or unless he becomes liable because of the nature of the instrumentality entrusted to the servant (see §§ 212–214), he is not liable for such acts.

"Illustration: 4. A is employed to eject trespassers. A boy of four seeks to enter the premises. A could easily prevent the child from so doing by calling to him. Instead, he shoots at the child and kills him. This evidence indicates that A was not actuated by an intent to perform his master's business and hence that his act was not within the scope of his employment."

Our foregoing decision is supported by a number of cases decided by the courts of other states. In Howard v. Zaney Bar, 369 Pa. 155, 85 A.2d 401 (1952), a bartender shot a customer who was annoying a female patron. It was held that he was not acting within the scope of his employment even though he had been instructed to maintain order. In so ruling the court stated:

"It was the duty of the bartender to maintain order. To perform this duty, inherently the bartender was authorized to use all *reasonable* means to maintain an orderly establishment. In keeping and maintaining order he was no doubt furthering the business of his employer. And in using any reasonable means to secure order he was acting within the scope of and in the course of his employment. * * * However, when the bartender * * * pulled out a gun and shot plaintiff, the bartender then de-

parted from the scope of his employment. Such a use of violence under these circumstances is shocking and a gross abuse of all authority the bartender possessed to maintain order. * * * The disorder, if any, was so insignificant and the use of violent force so excessive and dangerous * * * that we are compelled *as matter of law* to absolve defendant of vicarious liability." 85 A. 2d l. c. 402.

In Potter Title & Trust Co. v. Knox, 381 Pa. 202, 113 A.2d 549 (1955), a cab driver fired at a group of strikers who had made some remarks to him, and killed a bystander. In holding that the employer was not liable the court stated:

"In the present case there was obviously no need for Allen, the taxicab driver, to protect himself. The testimony indicates that none of the strikers possessed or used firearms. * * * and not one of the men on the corner made a move to leave the sidewalk, to approach Allen in his taxicab, or to molest him in any manner. Moreover, he was already on his way when he fired at the group behind him,—a criminal act for which he was properly indicted and convicted. It was an act wholly unauthorized by his employers,—the kind of an act which the law, in one of its rare drolleries, terms a 'frolic' of his own." 113 A.2d l. c. 552.

The rule here involved is also followed in another Pennsylvania case, i. e., Lunn v. Boyd, 403 Pa. 231, 169 A.2d 103 (1961).

The Restatement rule was followed in Adami v. Dobie, 440 S.W.2d 330 (Tex. 1969), wherein an agent who was authorized to look after the land and keep the gates closed shot and killed a person who left a gate open. In holding that the principal would not be liable the court stated that "[a] master is not liable for unauthorized intended tortious conduct of his servant, even when the act was done in connection with the servant's employment, where the wrongful act was unexpectable,

in view of the duties of the servant. * * * The commission of a deadly assault is not a customary way of performing a duty which involves seeing 'about the gates being closed.'" 440 S.W.2d l. c. 334.

Our view is also supported by Strawder v. Harrall, 251 So.2d 514 (La.App.1971). There, a filling station employee shot a customer, who was buying a package of cigarettes, for an inconsequential reason. The court, in holding that the master was not responsible, stated that "the trial judge has properly applied the law in accordance with the evidence before the court, and Harrall's employer, Jefferson Oil Company, cannot be held liable on this account for his intentional wrong * * *. Although Harrall had been in the process of selling a package of cigarettes, clearly a duty with which he was charged, his act of procuring the shotgun and shooting the minor boy amounted to a departure from the scope of his authority, which was in no way associated with the responsibilities devolving upon Harrall." 251 So.2d l. c. 517. To like effect is another filling station case, i. e., Martin v. Jones, 302 Mich. 355, 4 N.W.2d 686 (1942). Another supporting case is Lombardy v. Stees, 132 Colo. 570, 290 P.2d 1110 (1956).

It should perhaps be noted that we are not here considering a situation where an employer knows that the employee has vicious propensities. There was no evidence of that kind in this case and hence we need not consider the effect that would be given to such evidence in a proper case.

In contending that the trial court ruled correctly in overruling the motion for a directed verdict plaintiffs have cited the following cases: Barger v. Green, 255 S.W. 2d 127 (Mo.App.1953); Bova v. St. Louis Public Service Co., 316 S.W.2d 140 (Mo. App.1958); Haehl v. Wabash R. Co., 119 Mo. 325, 24 S.W. 737 (1893); Panjwani v. Star Service & Petr. Co., 395 S.W.2d 129 (Mo.1965), and Simmons v. Kroger Grocery & Baking Co., 340 Mo. 1118, 104 S. W.2d 357 (1937). In view of the theory

upon which we have decided this case, most of those cases are not applicable. However, we think we should discuss the Haehl and Panjwani cases. *Haehl* was a wrongful death action in which a man was shot and killed by a bridge watchman employed by the railroad. At the time of the shooting the watchman was in the act of causing decedent to leave the bridge. Although the watchman was engaged in the performance of his duties, the shooting was entirely unnecessary as the decedent was in the act of complying with his command to leave the bridge. It was held that the watchman was acting within the scope of his employment and plaintiff was permitted to recover. It may be that *Haehl* is distinguishable from our decision in this case on the theory that the railroad should have anticipated that their watchman might use unnecessary violence in the performance of his duties. There are certain statements in the opinion, however, that are not in accord with the views we have heretofore expressed. For example, it is stated that "it was not necessary, to render the defendant liable, that it should have authorized its watchman to kill the deceased, or sanctioned the deed after it was done; and, however wanton or malicious it was, the principal is liable if it was done in the course of the servant's employment." 24 S.W. 1. c. 741.

In *Panjwani,* the filling station attendant became angry when plaintiff bought only one dollar's worth of gasoline and requested additional service such as checking the oil and tires. When plaintiff refused to leave without such service the attendant struck him in the face with the nozzle of a pump hose inflicting severe injuries. On appeal this court held that a submissible case was made against the employer under the doctrine of respondeat superior. While the facts in Panjwani differ from those in the case at bar, we note that the opinion approves a statement similar to that heretofore quoted from *Haehl.* To the extent that the decisions and statements in Haehl and Panjwani (or any other decisions of our appellate courts) conflict with the views heretofore expressed, they should no longer be followed.

For the reasons heretofore stated, the judgment against appellant Pacer Oil Company is reversed.

DONNELLY, C. J., HENLEY, and FINCH, JJ., concur.

MORGAN, J., dissents in separate dissenting opinion filed.

SEILER and BARDGETT, JJ., dissent and concur in separate dissenting opinion of MORGAN, J.

MORGAN, Judge (dissenting).

I respectfully dissent, because of my belief that the law that has been established and applied in Missouri for many years, pertaining to the problem posed in this case, lends itself more readily to reaching a logical and fair result than can ever be attained after adding the "foreseeability" test, advanced in Restatement of Agency 2d, § 231, and now adopted by the majority opinion.

In Haehl v. Wabash R. Co., 119 Mo. 325, 24 S.W. 737 (1893), this court adopted what it considered to be a "lucid statement of the principle of liability" with which we are now concerned, to-wit:

" 'The principle of respondeat superior applies only when what is complained of was done in the course of the employment. The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in and about his business, and carrying out his purposes. He is then responsible, because the thing complained of, although done through the agency of another, was done by himself; and it matters not in such case whether the injury with which it is sought to charge him is the result of negligence, unskillful or of wrongful conduct, for he must choose fit agents for the transaction of

his business. But if his business is done, or is taking care of itself, and his servant, not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has and can have no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant, for which he, and he alone, is responsible.' "

Thereafter, after determining that the employee's act fell within the principle noted, the court declared at l. c. 741, that " . . . however wanton or malicious it was, the principal is liable if it was done in the course of the servant's employment."

Recently, this court considered the same problem in connection with a factual situation almost identical to that here in Panjwani v. Star Service & Petroleum Company, 395 S.W.2d 129 (1965), and therein said:

"The appellants, as manager and owner, do not challenge the general rule that for an assault and battery by an acting manager their customer may recover both actual and punitive damages; 'the overwhelming weight of authority supports the proposition, either expressly or by necessary implication, that an employer may be held responsible in tort under the doctrine of respondeat superior for an assault committed by his employee while acting within the scope of the employment, even though the latter acted wantonly, and contrary to the employer's instruction.' 34 A.L.R.2d 372, 396, 'Liability of employer * * * for a personal assault upon customer, patron, or other invitee.' The Missouri cases following and applying this general rule are all collected in that annotation and it is not necessary to list them here."

Thereafter, it was ruled, l. c. 131[2], that " . . . plaintiff made a submissible case of a vicious, unprovoked assault and battery 'as plaintiff was engaged in trying to settle a controversy concerning a portion of defendants' business, on the premises, during working hours . . .' "

In the instant case, as was true in both *Haehl* and *Panjwani,* the incident that gave rise to the employee's violent and criminal act was an incident attendant to the employer's business. Necessarily, the majority opinion does not find the facts otherwise.

From all of which, it may be fairly stated that heretofore the courts of Missouri have resolved similar cases by determining one ultimate question, i. e., was the employee acting within the scope of his employment?

Adoption of the "foreseeability" test will not avoid resolving the question as to whether or not the employee acted within the scope of his employment, but will add another factor, i. e., did the employee commit a "minor" crime or a "serious" crime against the customer? I would submit that if the act is done within the scope of employment—the basis for the respondeat superior doctrine—it is unimportant how the action of the employee might be classified. It would not be facetious to suggest that adding the latter factor would justify a conclusion that an employer would be liable if the employee hit a customer with his left hand (assumed to be a "minor" crime) but would not be if the employee clobbered the customer with his right hand (assumed to be a "serious" crime).

Furthermore, the "foreseeability" test is logically more applicable to a claim premised on a theory that the employer failed "to exercise ordinary care in employing a proper servant," Priest v. F. W. Woolworth Five & Ten Cent Store, 228 Mo. App. 23, 62 S.W.2d 926, 928 [4], than it is to a claim based on a theory of respondeat superior.

Finding no persuasive or compelling reason for Missouri to abandon the reasoning followed by a majority of the states, I would affirm the judgment and necessarily must dissent.