**Marjorie BATES, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Juanita Ann DECKARD, et al., Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 82–1381.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1982.

Decided March 8, 1983.

738

Karl Zobrist, David R. Erickson, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for Marjorie Bates.

David E. Wilhite, Lebanon, Mo., for Juanita Deckard.

Dan L. Birdsong, Routh, Thomas, Birdsong & Hutton, Rolla, Mo., J. Max Price, Salem, Mo., for Leroy Arlo Bates and Mr. and Mrs. James Hawkins.

Darrell Deputy, Jr., Lebanon, Mo., for Mr. and Mrs. Hershel Needham.

Robert G. Ulrich, U.S. Atty., Kenneth Josephson, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before ROSS and FAGG, Circuit Judges, and WATERS,* District Judge.

H. FRANKLIN WATERS, District Judge.

These are actions brought by several plaintiffs against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq., resulting from the murder of three young persons and the serious injury of another by a military policeman at Fort Leonard Wood, Missouri, military base. The parties entered into stipulations of fact and filed cross-motions for summary judgment, and the district court [1] denied the motions of the plaintiffs and granted the motions of the United States. Plaintiffs appealed from the judgment of the court. We affirm.

I.

FACTS.

On January 13, 1977, Specialist 4 Johnny Lee Thornton, while a military policeman on the Fort Leonard Wood, Missouri, military base, murdered with his government-issued 45-calibre pistol three teenagers and attempted to murder another. He was later convicted of kidnap, rape, assault with intent to kill, and murder. The plaintiffs are Juanita Ann Deckard, the only survivor of the incident, and the parents of the deceased victims, Anthony Lee Bates, Wesley Hawkins and Linda Needham. In an excel-

---

* The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas, sitting by designation.

1. The Honorable William R. Collinson, Senior United States District Judge for the Western District of Missouri.

lent and exhaustive opinion, 517 F.Supp. 1350, the trial court set forth the facts stipulated to by the parties as follows:

The stipulations of facts state that on January 12–13, 1977, Johnny Lee Thronton was a Specialist 4 in the 463rd Military Police Company, stationed at Fort Leonard Wood, Missouri. At all relevant times on January 12–13, 1977, Thornton was on active duty as a member of the United States Army and as an employee of the Department of the Army, an agency of defendant United States of America. Thornton was a military policeman assigned to the Game Warden Section of the Provost Marshal Office at Fort Leonard Wood, Missouri. All the facts which form the basis of the present action occurred on the Fort Leonard Wood Military Reservation in Pulaski County, Missouri.

Thornton's duties consisted of the random and selected patrolling of Fort Leonard Wood. Thornton checked permits, assisted sportsmen, and patrolled for fish and game violators, poachers, and trespassers. He was also to search for illegal trash dumping; the destruction, dumping or cutting of trees; and the destruction of wildlife food plots.

Thornton's work involved a minimal amount of supervision and a high degree of professional competence. In addition to his game and wildlife duties set out above, Thornton also had authority to arrest military personnel and to detain civilians for any suspected crimes and could make such arrests or detention on any and all parts of the Army base. It was Army policy that the detention of civilians for suspected crimes be limited to only such time necessary to release a civilian to federal or state law enforcement officials.

On the evening of January 12, 1977, Thornton reported for duty and was issued several items of United States Army equipment by agents of defendant United States. He was issued a four-wheel drive military police jeep which was utilized by Thornton while he was on duty on January 12–13, 1977. The vehicle was clearly marked as a military police vehicle and Thornton was in full military uniform at all times during this period.

Thornton was also issued several other items of United States Army equipment by agents of defendant United States. He was given one U.S. Army 45-calibre pistol, several rounds of ammunition, two pairs of military police handcuffs and one military police badge. It was not unusual for someone acting in Thornton's capacity to check out two pairs of handcuffs or several rounds of ammunition before going on duty.

While on duty on the evening of January 12–13, 1977, Thornton stopped a vehicle by using his red emergency lights on his military police jeep. The vehicle was driven by Anthony Lee Bates and occupied by passengers Wesley Hawkins, Juanita Ann Deckard, and Linda Needham. All the occupants of the car were teenagers who lived in the Fort Leonard Wood area. Thornton informed Bates and Hawkins that the southgate Texaco station, a nearby gas station which is not on United States property, had been robbed and that Bates' car matched the description of the car involved in the robbery. While the southgate Texaco station was not, in fact, robbed on January 12–13, 1977, it is agreed that if the southgate Texaco station had been robbed, as Thornton alleged, he would have had the authority to stop and detain suspected vehicles on the military base while he was on duty.

After stopping the vehicle, Thornton ordered the two males, Bates and Hawkins, to get out of the car. He handcuffed Bates and Hawkins' hands behind their backs and placed the two youths in the back seat of the military police jeep. Then, without provocation, Thornton shot Anthony Lee Bates and Wesley Hawkins through the chest with his military issue 45-calibre pistol as they sat handcuffed in the back seat of the jeep.

After shooting Bates and Hawkins, Thornton ordered Juanita Ann Deckard and Linda Needham into the jeep and

took them to a cabin on a remote part of the Army base. He then forcibly raped the girls and forced them to commit oral sodomy upon each other and to commit oral sodomy upon him. Afterwards, Thornton shot the two girls. He then buried all four victims in the snow and left them for dead. Anthony Lee Bates, Wesley Hawkins, and Linda Needham died as a result of the gunshot wounds inflicted by Thornton. Juanita Ann Deckard was the only survivor of Thornton's attack. On July 26, 1977, in criminal proceedings before this Court Thornton was convicted of murder in the first degree, assault with intent to kill, rape, and kidnapping for the purpose of committing rape.

## II.

## DISCUSSION.

None of the parties contend that the trial court's summarization of the stipulated facts is in error in any regard, but the plaintiffs earnestly contend that the trial court erroneously applied these facts to the applicable law. Specifically, the plaintiffs contend that the trial court's granting of the summary judgment in favor of the United States "was clearly erroneous and contrary to the law in that Specialist 4 Johnny Lee Thornton was acting within the course and scope of his employment at the time that he committed the assaults and murders on January 12–13, 1977."

These actions were brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.,* and the parties agree that the issue that the trial court had to determine, and that this court must review, is whether Thornton, at the time of the shootings, rapes, and assaults was acting in the course of and in the scope of his employment as a military policeman. This issue is to be determined by the application of state law, and plaintiffs do not contend otherwise. *See* p. 11 of Plaintiffs' Brief, and *Stencel Aero Engineering v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977); *Bissell v. McElligott,* 248 F.Supp. 219 (D.C.Mo.1965), *aff'd,* 369

F.2d 115 (8th Cir.1966), *cert. denied,* 387 U.S. 917, 87 S.Ct. 2029, 18 L.Ed.2d 969 (1967).

Thus, the responsibility of the trial court, and the responsibility of this court, is to apply the law of the state of Missouri as announced by applicable decisions of the highest court of that state, and when this is done, this court is convinced that the trial court correctly decided these cases.

The seminal case on the law of *respondeat superior* in Missouri is *Haehl v. Wabash R. Co.,* 119 Mo. 325, 24 S.W. 737 (1893). The law, as announced in *Haehl, supra,* was the law in Missouri with little change from 1893 until a decision of the Missouri Supreme Court in 1973 in *Wellman v. Pacer Oil Co.,* 504 S.W.2d 55 (Mo.1973).

The landmark case of *Haehl, supra,* was an action for the wrongful death of a man shot by a bridge watchman employed by the defendant railroad. The decedent was crossing a railroad bridge and, after being halted and turned away by the watchman, he started to leave the bridge and was pursued and shot while still upon the bridge approach. In what has now become an oft-quoted passage, the Missouri court pronounced the Missouri rule on *respondeat superior* as follows:

The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in or about his business, and carrying out his purposes. He is then responsible because the thing complained of, although done through the agency of another, was done by himself; and it matters not in such case whether the injury with which it is sought to charge him is the result of negligence, unskillful or wrongful conduct, for he must choose fit agents for the transaction of his business. But if his business is done, or is taking care of itself, and his servant, not being engaged in it, not concerned about, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked

or unprovoked, commits an assault upon another, when that has and can have no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant, which he, and he alone is responsible.

After announcing this principle, the court held the defendant company liable and stated "it was not necessary to render the defendant liable, that it should have authorized its watchman to kill the deceased or sanction the deed after it was done; and however wanton or malicious it was, the principal is liable if it is done in the course of the servant's employment." *Haehl, supra,* 119 Mo. at 340–341, 24 S.W. at 741.

After the 1893 decision, the Missouri Court, in a number of cases, applied this principle with almost no change.[2] These opinions are discussed in some detail in the trial court's exhaustive opinion, but the court believes it would serve no purpose to set forth those holdings in any detail in this opinion. Suffice it to say that the rule remained relatively unchanged until the decision in *Wellman, supra.*

In *Wellman,* plaintiff purchased gasoline at a service station operated by defendant, Pacer Oil Company. An employee of the defendant serviced plaintiff's car, and shortly after he left the station, the hood of his car flew up as he was driving down the road. He returned to the station and accused defendant's employee of "messing up" the hood. In the ensuing argument, the employee pulled a gun and shot plaintiff. Plaintiff stumbled back to his car and got in the driver's seat. The employee followed plaintiff, opened the car door and shot plaintiff again, inflicting serious and permanent injuries. Plaintiff brought suit

against Pacer Oil Company, and on appeal, the Supreme Court of Missouri held that "the actions of Gamble (the employee) were so outrageous and criminal—so excessively violent as to be totally without reason or responsibility—and hence were, (as a matter of law), not to be within the scope of his employment." *Id.* at 58.

The *Wellman* decision modified to a significant extent the court's decision in *Haehl.* In *Haehl,* the court stated: "However wanton or malicious it was, the principal is liable if it is done in the course of the servant's employment." 119 Mo. at 340–341, 24 S.W. at 741.

■ Thus, prior to the *Wellman* decision, the law in Missouri was that the principal could be liable for the agent's acts, regardless of how outrageous they were, if the agents were actually engaged in the principal's business and not impelled by personal motives. We are convinced that the Missouri Supreme Court, en banc, has now modified the law as announced in *Haehl, supra,* and in order for a principal to be liable for his agent's acts, the acts must not only be taken in furtherance of the principal's business and not impelled by personal motives, but they also must not be "so outrageous and criminal—so excessively violent as to be totally without reason or responsibility."

■ We are saddened by the outrageous conduct which resulted in these cases, and are not unmindful or unsympathetic to the innocent plight of the plaintiffs and the emotional suffering that has been visited upon them, but the court is convinced that to hold the United States Government legally responsible under the circumstances of this case for the barbarous conduct of its employee would be totally contrary to the law of Missouri which, as was indicated

**2.** *See for example DeMariano v. St. Louis Public Service Co.,* 340 S.W.2d 735 (Mo.1969); *Pyles v. Bos Lines, Inc.,* 427 S.W.2d 790 (Mo. App.1968); *Burks v. Leap,* 413 S.W.2d 258 (Mo.1967); *Panjwani v. Star Service & Petroleum Co.,* 395 S.W.2d 129 (Mo.1965); *Miceli v. Williams,* 293 S.W.2d 136 (Mo.App.1965); *Abel v. Campbell "66" Express, Inc.,* 378 S.W.2d 269 (Mo.App.1964); *Peak v. W.T. Grant Co.,* 386 S.W.2d 685 (Mo.App.1964); *Stone v. Reed,* 247 S.W.2d 325 (Mo.App.1959); *Bova v. St. Louis Public Service Co.,* 316 S.W.2d 140 (Mo.App. 1958); *Tockstein v. P.J. Hammill Transfer Co.,* 291 S.W.2d 624 (Mo.App.1956); *Milazzo v. Kansas City Gas Co.,* 180 S.W.2d 1 (Mo.1944); *State ex rel. Gosselin v. Trimble,* 328 Mo. 760, 41 S.W.2d 801 (1931).

above, this court is bound to apply. We believe and find that Thornton's acts in stopping the car, handcuffing and killing the young men and assaulting and raping the young women and shooting them, could not, under any circumstances, be construed to have been in furtherance of his employer's business or incident to any business of his employer. On the contrary, in the words of *Haehl, supra,* his acts were "impelled by motives that are wholly personal to himself, and simply to gratify his own feeling ..." In any event, just as the trial court found, even if it could be said, for the sake of argument, that the acts were within the course of and in the scope of his employment, we cannot escape the plain holding of *Wellman, supra.* How could it be said that Thornton's outrageous and sadistic conduct in this case was not "so outrageous and criminal—so excessively violent as to be totally without reason or responsibility?" Under the circumstances, we have no choice but to affirm the trial court's ruling that the conduct of Thornton did not arise out of and in the scope of his employment and that, thus, the United States is not liable for his acts.

In support of their contention that the government should be held to be liable in this case, the plaintiffs rely upon *Brown v. Associated Dry Goods, Inc.,* 656 F.2d 306 (8th Cir.1981); *Mansfield v. Smithie,* 615 S.W.2d 649 (Mo.App.1981); *Bova v. St. Louis Public Service Co.,* 316 S.W.2d 140 (Mo.App.1958); *Butler v. Circulus, Inc.,* 557 S.W.2d 469 (Mo.App.1977); and *Panjwani v. Star Service & Petroleum Co.,* 395 S.W.2d 129 (Mo.1965). We do not believe that it would serve a useful purpose to discuss each of these cases in detail. Suffice it to say that the court, after having reviewed these opinions, believes that, in each of them, the incidents in question arose out of an attempt by the employee to carry out his employer's business. In each instance, he went considerably further than his employer undoubtedly intended him to, but, in each instance, the act in question occurred as a result of his attempt to carry out his assigned duties. In this case, Thornton did not, by any stretch of the imagination, set out to do his employer's business, and then simply go too far. He set out to gratify his own desires and was impelled by his own motives and did not, at any stage of the incident which resulted in this tragedy, intend to further or actually further to any degree his employer's business. Thus, under the law of Missouri, the employer cannot be held responsible.

### III.

### CONCLUSION.

For the foregoing reasons, we affirm the district court's denial of the motion for summary judgment of the plaintiffs and its granting of the motion for summary judgment of the defendant.