Sam MANSFIELD, Plaintiff-Respondent,

v.

Bill SMITHIE, Tommy Hyde, and Betty Hyde and the Cardwell Country Club, Inc., Defendants-Appellants.

No. 11840.

Missouri Court of Appeals, Southern District.

April 27, 1981.

650

Edward L. Downs, Downs & Johnson, Cape Girardeau, for defendants-appellants.

James C. Bullard, Kennett, for plaintiff-respondent.

**PER CURIAM:**

By his first amended petition, the plaintiff alleged that he was assaulted by Bill Smithie who was acting as the agent of Cardwell Country Club, Inc., and Tommy Hyde and Betty Hyde. He prayed compensatory damages in the amount of $50,000.00. A jury returned a verdict against all the defendants in that amount. All defendants appeal presenting four points of alleged error. Only the points so presented will be considered by this court. *Bryan v. Vaughn,* 579 S.W.2d 177 (Mo.App.1979).

▪ A summary of the evidence follows. However, in the review of the points of alleged error the evidence and all reasonable inferences therefrom supporting the verdict must be accepted and the defendants' evidence disregarded except where it supports the verdict. *Smoot v. Marks,* 564 S.W.2d 231 (Mo.App.1978).

Defendants Hyde owned property in Cardwell used for dancing and the sale of food and drink, referred to as a nightclub. For at least ten years prior to 1977, defendants Hyde owned and operated a nightclub on that property. In 1977, when they had a problem with selling liquor by the drink, they changed the name of it from the American Club to the Cardwell Country Club.

Cardwell Country Club, Inc., was incorporated on October 8, 1977, as a not-for-profit corporation under Chapter 355, RSMo 1969. The incorporators and initial directors were Tommy L. Blackford, Betty Ross Hyde and Thomas W. Hyde. The stated purpose of the corporation was:

To operate a country club for the citizens of Cardwell, Missouri, and the surrounding area of southeast Missouri and northeast Arkansas, which includes the operation of a clubhouse, recreational and sporting activities including but not limited to tennis, swimming, and golf; and any and all other things not forbidden by law or contrary to the provisions of Chapter 355, Revised Statutes of Missouri, 1969.

The evidence concerning the status of the corporation and subsequent operation of the business is sketchy. There was testimony that subsequent to the incorporation the business was operated by the Hydes. Defendant Tommy Hyde testified that he was the manager. Defendant Betty Hyde testified that she was the secretary and kept all of the records. Other than the W-2 form and payroll records hereafter referred to, no financial records of the corporation or of the Hydes were introduced. The auditors had lost the copies of employment security and other returns and records. Tommy Hyde did not know if the corporation had filed a tax return with the Internal Revenue Service for either 1978 or 1979. Four occupational licenses pertaining to periods after the incident in question were introduced. The county liquor license was issued to Tommy Hyde and the other three were issued in favor of Cardwell Country Club, Inc. After the instant lawsuit was commenced, a lease was prepared whereby defendants Hyde leased the nightclub property to Cardwell Country Club, Inc., retroactively commencing October 8, 1977. The lease was not signed on behalf of the corporation, although the corporate acknowledgment indicated it was so signed by its vice president Tommy Blackford before Notary Public Tommy Hyde.

The corporation was said to have issued 200 memberships at $35.00 each. Yet, Tommy Hyde and Betty Hyde testified that they owned all of the stock in this not-for-profit corporation. In answer to the question, "Now you and your wife live together and share in the profits and so forth of the

club?" Tommy Hyde replied, "Yes, we do" and he added, "they always have". He further stated that prior to June of 1979, he and his wife "was living out of the club the same way that we are living now" and that the proceeds that came in went to him and his wife "if there was any left". Concerning his wife's activities, Tommy Hyde concurred with plaintiff's counsel that his wife agreed with the way that he ran it and that was true before and after the incorporation.

Defendant Smithie had been associated with Tommy Hyde in business for a number of years. At times, he had been employed as a bartender, bouncer and general helper at the nightclub. However, defendants Hyde and Smithie testified this employment terminated in November, 1978, and he did not again work at the nightclub until the months of June, July and August, 1979. Betty Hyde identified the payroll records she prepared corroborating this employment history. Defendant Smithie produced and identified a copy of a W–2 form issued by Cardwell Country Club, Inc., for 1979 for the total amount of wages shown on the payroll records. Smithie testified that at the time in question he and Tommy Blackford, an incorporator and vice president of Cardwell Country Club, Inc., had leased a lot adjoining the nightclub and were in the used car business. Defendant Smithie said he was at the nightclub on the evening in question as a patron.

On June 8, 1979, after work, the plaintiff was in the nightclub from approximately 4:30 p. m. to 6:30 p. m. drinking and visiting. After a trip to his parents' home to clean up, he returned and visited and drank until about 1:00 a. m. The plaintiff did not have a membership but was admitted as a guest. During the evening, the plaintiff observed that a patron had pulled a gun and stuck it in another man's face. The peace officer who was there at the time left. When another officer arrived, the plaintiff spoke to him. When the plaintiff

and his party were ready to leave, Smithie asked to speak to him in the poolroom. He followed Smithie and Tommy Hyde into the poolroom. There the plaintiff was told to be seated and he was interrogated about why he had called the law. When he denied doing so, defendant Smithie hit him in the face several times with brass knuckles. Plaintiff stated he did not try to defend himself because of his fear of Tommy Hyde. When Tommy Hyde said, "that's enough, let him go", the plaintiff started out. But Smithie hit him again and Tommy Hyde said, "I said that is enough, Bill." The plaintiff then left and was taken to the hospital. A friend of the plaintiff witnessed and corroborated a part of the assault.

Defendant Smithie testified that during the course of the evening plaintiff spoke to him three times concerning an old grudge. The third time the plaintiff invited Smithie to the poolroom, from which they repaired to the outside. There, he said, the plaintiff attacked him and he hit the plaintiff in self-defense. When they went back to the poolroom, Tommy Hyde ordered them from the premises. The defendants produced several witnesses who testified to the plaintiff's reputation as a bully and for violence. Tommy Hyde confirmed his limited participation as related by defendant Smithie.

In two related points defendant Tommy Hyde and defendant Betty Hyde have asserted that the evidence is insufficient to support the jury's determination that Smithie was acting as their agent within the scope of his authority.[1] As stated in their brief, these points are each first premised upon the proposition that "any existing liability based upon agency should be limited to the defendant Cardwell Country Club, Inc." To so insulate themselves from liability these defendants cite the corporate charter and their testimony that the business was being conducted by Cardwell Country Club, Inc.

1. For the subtle difference between an agent and a servant see 53 Am.Jur.2d *Master and Servant* § 3 (1970) in which it is said: "It is generally agreed that no basic or fundamental distinction is to be drawn between the liability of the principal for the tort of the agent and the liability of the master for the tort of his servant." Without attaching any significance to the choice, this opinion generally will adopt the language of agency.

653

■ Even ignoring for the consideration of this proposition, the obvious liability of Tommy Hyde arising from his personal involvement, the evidence does not compel such an absolution. Even further assuming the business was in all respects such as the receipt and disbursement of funds conducted in the name of the corporation, those defendants are not necessarily absolved from liability. The acts of those defendants in handling the affairs of the corporation provide a basis for disregarding the corporate entity. 18 Am.Jur.2d Corporations § 15 (1965). "The underlying theory seems to be that where stockholders, by those acts, show that they themselves ignored the corporate entity, the courts will do likewise. . . . [T]he corporate entity has been ignored by the courts when the stockholders were conducting the business of the corporation as individuals or as partners . . . ." Annot., Disregarding Corporate Entity, 46 A.L.R.3d 428, 430–431. These defendants demonstrated their total disregard for the corporate entity of Cardwell Country Club, Inc. They regarded themselves as the sole owners of that not-for-profit corporation; they lived out of the club the same as they did before incorporation; and they shared the profits as they always had. There was an ample basis in the evidence for the jury to conclude that in fact those defendants continued to operate the club as they had for more than ten years and, as Betty Hyde put it, changed the name when the corporation was created. Under these circumstances, it requires no further citation of authority to demonstrate that the corporate existence of Cardwell Country Club, Inc., does not absolve Tommy Hyde and Betty Hyde from liability as operators of the nightclub.

■ These defendants next contend they cannot be held vicariously liable because (1) defendant Smithie was not employed by them, and (2) he was not acting within the scope of his employment. These points must be considered separately in respect to Tommy Hyde and Betty Hyde. Tommy Hyde on two occasions directed Smithie that he had administered enough punishment to the plaintiff. From all the circumstances, including these directions, the jury

could, and it obviously did, reasonably infer that Tommy Hyde believed the plaintiff had called the law enforcement officers to the club; that this was detrimental to the business; and that for his action the plaintiff should be physically punished. Whether or not Smithie was being paid or was on the payroll of the Hyde's or Cardwell Country Club, Inc., at the time of the assault is not decisive. Restatement (Second) of Agency § 225. Tommy Hyde was responsible for an assault committed at his direction. *Fordyce v. Montgomery*, 424 S.W.2d 746 (Mo.App.1968); *Watters v. Hayden*, 219 Mo.App. 673, 284 S.W. 828 (1926).

Liability of Betty Hyde must rest on a different basis. Her liability is that of a partner for the act of another partner, which in this respect is governed by the principle of agency. "Generally speaking, and on the principles of mutual agency, the partnership, and each member, is liable for torts committed by one of the members acting in the scope of the firm business, although they do not participate in, ratify, or have knowledge of such torts." *Martin v. Yeoham*, 419 S.W.2d 937, 951 (Mo.App. 1967). Also see Annot., Partner—Joint Adventurer—Assault, 30 A.L.R.2d 859. This analysis is particularly appropriate in view of the evidence that Betty Hyde entrusted the management of the business to Tommy Hyde. Betty Hyde is liable if Tommy Hyde in directing the assault upon the plaintiff was acting within the scope of his authority as the managing partner.

■ The fact an agent uses physical force not expressly authorized by his principal does not per se exonerate the principal. Restatement (Second) of Agency § 245 provides: "A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant." This section was approved in *Henderson v. Laclede Radio, Inc.*, 506 S.W.2d 434 (Mo.1974). Whether or not an agent's use of force is

within the scope of his employment is dependent upon many factors. Annot., Assault by Servant, 34 A.L.R.2d 372. Also see Restatement (Second) of Agency §§ 228 and 229. Of primary importance are the nature of principal's business, whether or not the employment will bring the agent into contact with the public and the likelihood his employment will involve the use of force, *Henderson*; whether or not the agent acts within authorized hours and at an authorized place, *Henderson*; and whether or not the agent acts from a personal motive. *Smith v. Lannert*, 429 S.W.2d 8 (Mo.App. 1968); *Thompson v. Portland Hotel Co.*, 209 Mo.App. 476, 239 S.W. 1090 (1922). Also see Comment c to § 235 of Restatement (Second) of Agency. However, a principal will not be held vicariously liable if the acts of the agent are "outrageous and criminal—so excessively violent as to be totally without reason or responsibility ...." *Wellman v. Pacer Oil Company*, 504 S.W.2d 55, 58 (Mo. banc 1973). Also see *Henderson v. Laclede Radio, Inc.*, supra.

■ In this case the nature of the business did bring Tommy Hyde into contact with the public and his use of force in that business was not unlikely. He did act within the hours of his employment and at an authorized place of employment. The jury could conclude the defendants Hyde were making at least an unorthodox use of a not-for-profit corporation and did not welcome frequent visits by law enforcement officers. It could be further reasonably inferred that defendant Tommy Hyde was not acting from a personal motive but for the interests of the business. Under all the circumstances, it cannot be held as a matter of law that Tommy Hyde's actions were so outrageous and unexpected as to fall within the doctrine declared by *Wellman* and *Henderson*. Compare *Butler v. Circulus, Inc.*, 557 S.W.2d 469 (Mo.App.1977); *Davis v. DelRosso*, 371 Mass. 768, 359 N.E.2d 313 (1977).

■ All the defendants contend that the verdict is so excessive as to demonstrate it was the result of bias and prejudice of the jury and ask that a new trial be granted. However, they recognize that a new trial is not mandated unless some "other error" has been committed in the trial of the case. *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977). To establish such error, the defendants first complain of their unavailing objections to questions of Tommy Hyde concerning his reputation for violence and the rebuttal testimony of the sheriff that such reputation was that of a violent and dangerous man. It is true that generally evidence of such a reputation is inadmissible. However, the defendant Smithie pleaded self-defense. He placed in issue the question of who initiated the aggression, the plaintiff or Tommy Hyde acting through defendant Smithie. In civil actions for assault, when such an issue is raised, there is an exception to the rule. The defendants introduced evidence of the reputation for violence of the plaintiff. Under the circumstances of this case, the court did not err in admitting similar evidence of the reputation of Tommy Hyde. *Davenport v. Silvey*, 265 Mo. 543, 178 S.W.168 (1915); *Feliciano v. City and County of Honolulu*, 611 P.2d 989 (Hawaii 1980); *Carrick v. McFadden*, 216 Kan. 683, 533 P.2d 1249 (1975). Compare *State v. Page*, 577 S.W.2d 177 (Mo.App.1979). The defendants also complain of questions concerning the reputation of Smithie, past acts of violence at the club and other questions concerning Tommy Hyde's reputation. However, their objections to those questions were sustained. Having sought no further relief from the trial court, they may not now claim the trial court erred. *Brown v. Boyd*, 422 S.W.2d 639 (Mo.1968); *Sanders v. H & S Motor Freight, Inc.*, 526 S.W.2d 332 (Mo.App.1975). They also point to allegedly prejudicial argument by the plaintiff. Having made no objection at the trial to such argument, they cannot now so establish error. *Blevins v. Cushman Motors*, supra; *C & M Developers, Inc. v. Berbiglia*, 585 S.W.2d 176 (Mo.App.1979).

The defendants' last point is that the verdict is so excessive that a remittitur of $40,000 is required. As a result of the assault the plaintiff's face was bruised,

swollen and bloody. He suffered fractures of the dorsum of the nose and of the nasal septum with some deflection. The fracture of the dorsum was corrected by a closed reduction and the fracture of the septum was repaired by an open reduction with the removal of some bone and cartilage. The plaintiff complains of some nasal stuffiness and his breathing capacity may be decreased to some extent, but not a great deal. Future treatment is unlikely. There is no visible scarring, although there is a slight bow in his nose that was not previously present. The plaintiff was hospitalized four days. His medical specials were $1490 and he lost approximately $2600 in wages.

 While the factor of uniformity is but one factor to be considered in a review of an allegation of excessiveness, neither party has cited a case with comparable injuries. Research has developed two cases with somewhat similar injuries. In *Merrick v. Bridgeways, Inc.*, 362 Mo. 476, 241 S.W.2d 1015 (1951) the plaintiff had a severe cut on the head and a cut on the wrist. His medical bills totaled $204 and he lost $95 in wages. The court observed, "In this case there were no fractures and except for the scars on the head and wrist there is no particularly satisfying evidence of serious permanent injury." *Merrick*, 241 S.W.2d at p. 1023. A verdict for $11,000 was reduced to $7,500. In *Morgan v. Thompson*, 325 S.W.2d 794 (Mo.1959) the plaintiff sustained bruises, abrasions and lacerations and a fractured nose with curvature of the septum. No medical specials were shown and the plaintiff lost in excess of 15 days work at $1.98.5 per hour. A $10,000 verdict was reduced to $8,000.

 While these cases may be considered for guidance, the ultimate test is "what fairly and reasonably compensates plaintiff for the injuries sustained." *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. banc 1978). Factors to be considered in a negligence case are outlined in *Ricketts v. Kansas City Stock Yards of Maine*, 537 S.W.2d 613 (Mo.App.1976). In addition, in this case of assault, other factors that may be considered on the issue of compensatory damages are the indignity, disgrace, humiliation and mortification to which the plaintiff was subjected. *State ex rel. Donelon v. Deuser*, 345 Mo. 628, 134 S.W.2d 132 (1939). "As Justice Holmes put it 'even a dog distinguishes between being stumbled over and being kicked.'" *Davis v. DelRosso*, supra, 359 N.E.2d at 316. This is true even though such factors were not pleaded, *Hall v. Martindale*, 166 S.W.2d 594 (Mo.App.1942), and "[w]hile there was no evidence concerning humiliation or mental suffering, such items of damage may be inferred from the character and extent of the injuries without specific proof." *Thompson v. St. Louis Public Service Co.*, 242 S.W.2d 299, 303 (Mo.App.1951). Also see *Mullendore v. Gentry*, 377 S.W.2d 494 (Mo.App.1964); *Edelman v. Wells*, 242 S.W. 990 (Mo.App.1922).

 The determination of plaintiff's damages was primarily an issue for the jury. *McGowan v. Hoffman*, 609 S.W.2d 160 (Mo.App.1980). This is perhaps particularly true where the factors of indignity and humiliation are properly considered. *Mitchell v. Pla-Mor., Inc.*, 361 Mo. 946, 237 S.W.2d 189 (1951). Nevertheless, considering the limited physical injuries and special damages and the absence of any evidence that the plaintiff suffered from any indignity, disgrace, humiliation or mortification resulting from his assault, this court determines that the verdict is excessive in the amount of $15,000. Therefore if the plaintiff will within fifteen days remit the sum of $15,000 from the verdict, the judgment is affirmed; otherwise, the cause will be remanded for a new trial on all issues.

All concur except BILLINGS, J., recused.