Daniel J. NOAH, Plaintiff–Respondent,

v.

Ronald L. ZIEHL, Defendant–Appellant.

No. 53096.

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 8, 1988.

John Francis Cooney, Eugene K. Buckley, St. Louis, Thomas L. Fiala, Maryland Heights, for Ronald Ziehl.

Charles F. James, Wentzville, for Donald Ray Overton.

Frederick W. Drakesmith, St. Charles, for Daniel Noah.

SIMEONE, Senior Judge.

This is an appeal by Ronald L. Ziehl, the owner and proprietor of the Shady Grove Saloon, from a judgment entered upon a jury verdict in favor of plaintiff, Daniel J. Noah, against Donald Ray Overton, an employee of Ziehl's, and Ronald L. Ziehl for damages sustained when Noah was assaulted by Overton at Ziehl's saloon. The principal issue is whether the conduct of Overton was within the scope and course of his employment so as to subject the owner, Ziehl, to liability under the doctrine of *respondeat superior*. The employee, Overton, has not appealed. We conclude, for reasons hereinafter stated, that Overton's conduct in assaulting the plaintiff, under the specific facts of this case was excessively violent, and went beyond the scope and course of his employment so that his employer, the appellant, should not be vicariously liable.

## I.

Although in many respects the testimony was contradictory and two or more versions of the events of December 9, 1982 were testified to, the following salient facts, taken in the light most favorable to the verdict, are as follows. On review, the evidence and all reasonable inferences therefrom supporting the verdict must be accepted. *Mansfield v. Smithie*, 615 S.W. 2d 649, 651 (Mo.App.1981).

In December, 1982, Ronald L. Ziehl was the sole proprietor of the Shady Grove Saloon located in O'Fallon, Missouri. His manager and bartender at the time of the events was Jerry R. Malin. There were several other employees of the "saloon" including Donald Ray Overton, one of the original defendants in this cause and Cindy Marie Bell. Although he had no previous security experience, Overton was employed by the manager, Malin, some time before the December, 1982, incident in the capacity of a "doorman" or a "bouncer." Before being employed Overton had sometimes visited the Shady Grove, and was hired on a part-time evening basis when Malin needed someone to fill in for the regular doorman. According to Overton, the manager told him about his duties—he was to watch the door; he was to "card people" (check for identification cards and the age of patrons at the door); he was not to permit any drinks to go outside, and if there were any disturbances he was to try to stop them; he was not to let any customers get hurt and make sure that any disturbance or fight was outside.[1] Overton was also to make sure that all patrons left by 1:30 a.m.

---

1. According to a deposition of the owner, Ronald Ziehl, Overton was a "doorman." He was to check "ID's only." There were to be no weapons. If there were a disturbance, there was to be no violence. He was to make sure the patrons would leave and if there were more prob-

Part of his duties was to "make sure" that the bar was not "torn up" and not to "let anybody get injured; try to use as much force without hurting anyone if at all possible."

Cindy Marie Bell also was employed to check ID's and "contain the women." It was her duty to "physically remove people from the premises that [she] felt were causing problems" and to make sure that the "bar was not torn up." Her duties consisted of "carding" people and if a fight broke out, to break it up and see that it went outside.

On the evening of December 9, 1982, the plaintiff, Daniel Joseph Noah, a painter, and his friend, James E. Preis, visited the Shady Grove. They arrived at about 8:00 p.m. They stayed two and a half to three hours. During that time they shared at least two pitchers of beer. Before that evening Noah did not know Overton, but when the two arrived, Overton was working as a "doorman at the door." According to Noah, prior to the time he and Preis started to leave the establishment, there was no previous altercation between him and Overton. He expressly denied that he had been in a "fight or altercation" earlier in the evening in the "lower level" of the tavern. He testified that when he and Preis were leaving, "a girl approached me and asked me where I was going." He told her "we had to leave." Preis had already left the tavern. As Noah started out, there was a commotion; he couldn't get through the crowd and the woman was in front of him, "so I patted [her] on her—on her behind end to get her going, because I needed to get out of there because Jim was waiting [outside] for me." The woman happened to be Overton's girlfriend, Debbie Wittman. The next thing Noah knew was that Overton "grabbed me," and put a headlock on him. They started wrestling

inside the bar; they "got" pushed outside the door and Overton started biting Noah's thumbs and tried "to gouge" his eyes out. "He was trying to pull my eyeballs out of my head." Noah tried to break loose, but Overton grabbed him by his hair and started beating his head "up against the brick wall next to the door." He became dizzy. He dropped. Overton jumped on him with a knife; he "was going at my throat and I put my arm up to cover my throat and he stabbed me twice in the arm" with a "buck knife." After Noah was stabbed, someone pulled Overton off.

Noah's friend, Preis, had left the tavern and went outside to his truck. Noah was following Preis out. But when Preis got to the truck, Noah never came outside, so Preis started walking back in to see where Noah was. He then saw Noah and Overton coming out the door. They had "ahold" of each other and proceeded to get into a fight. He saw Overton grab Noah in the face, "trying to gouge his eyes." They ended up on the ground. Preis saw a knife,—"a large pocket knife." He saw him stab Noah—"it looked like a number of times." Preis grabbed Overton's wrist to stop him. He "yelled" at another person to take the knife out of Overton's hand. Preis saw blood on Noah. Preis then helped Noah into the truck and took him to the hospital. Noah stayed in the hospital two or three days, received several stitches, and incurred a bill of $606.00. He was off work for approximately three months.

Mark J. Weber, a patron at the Shady Grove, came into the tavern that evening about 12:30 a.m. after a softball game. He testified he saw Noah going out the door and saw Overton grab him. Weber saw Noah thrown out the front door. Overton reached for "something" in his pocket— "some type of sharp object." They went

---

lems, call the police. Ziehl testified that his policy was to remove any people who cause a disturbance and take them outside. Overton testified that his duties consisted of "just control the crowd; if a fight breaks out, try to keep other people from getting injured, try to get them outside, no weapons, no sticks." In addition to these duties, Overton would also "change the tappers"—put another keg in the bar. There was some evidence that Overton was permitted to drink while on duty as long as he did not become intoxicated. This was denied by Ziehl.

out the door; Weber could see the tops of their heads; he saw them fall to the ground and then "I saw Mr. Overton on top of him, and he had a knife and he was coming down on him.... All I saw was this motion constantly." The knife was 8″–10″ with a 6″ blade. Weber saw Overton's head and [his] arm "going up and down."

A different version of the events leading up to the fracas was given by the manager, Malin, Overton and Cindy Bell. It was their testimony that there had been a disturbance earlier in the evening which involved Overton and Noah and perhaps a friend of Noah's.

These persons testified that earlier in the evening there had been a disturbance "on the lower level, or the dance floor," where Noah and Overton were fighting. Malin broke them up, and took Overton away to cool off. Overton's hair had been pulled out, and he was "wretching deeply" complaining that he had been "kneed three times in the groin." Overton was in a high state of "anger." Noah was led out the door, but returned and became abusive. Overton desired to continue the combat, but Malin informed him it was not his duty to fight; his duty was to break up fights. Later the two recommenced fighting at the front door. Malin tried again to break up the fight, but people "restrained" him. Malin took Overton away, but Overton wanted "revenge" and "to get back at this guy." Noah was led out the door, and Overton resumed his duties at the front door. When he returned to the door, Noah came in from the outside and grabbed Overton by the hair and "pulled" him out. Then Overton "lost complete control." Overton admitted that he did some "pretty crude things to him." He admitted "I started beating on him when he was down on the ground, hitting him in his head to try to knock him silly. I wanted to get it over with, so I rolled him over to his belly and I stuck my fingers in his eyes, and I grabbed him by his groin and slammed his face on the concrete." Overton, however, denied stabbing Noah.

Noah's clothing was introduced as evidence. The clothing was blood-stained and there were knife slashes in it. Officer Steven D. Talbott of the O'Fallon Police Department took a statement from Overton that evening and Overton stated to him that he "stuck [his] fingers up to his knuckles into [Noah's] eye sockets." He denied, however, stabbing Noah. Officer Talbott was the person who applied for a warrant of assault in the first degree against Overton.

As a result of the December altercation, Overton was charged with a felony, but later pleaded guilty to third degree assault and was sentenced. After serving a few months he was placed on probation. Also as a result of the evening's events, Noah filed this civil suit against Overton and the owners of the tavern, Ronald and Donald Ziehl, for actual and punitive damages for the injuries sustained by him. He alleged that while Overton was serving in the capacity of a "guard or bouncer" for Ziehl, he was assaulted which resulted in serious bodily injuries.

Trial was held on February 17 and 18, 1987 at which the above facts were adduced. During the trial, the court dismissed Ronald's brother, Donald, since he had no proprietary interest in the tavern and overruled Ronald Ziehl's motion for a directed verdict at the close of the plaintiff's case. The separate motion of Ziehl's for a directed verdict also contended that the plaintiff failed to prove that Overton was acting in the course of his employment at the time of the attack and also contended that the acts of Overton were so "outrageous and criminal and so excessively violent" that, as a matter of law, his acts were not within the scope of his employment. The court overruled the motion.

The court gave a number of instructions relating to Overton and Ziehl. Instruction No. 8 was the verdict director for plaintiff against Ronald Ziehl, d/b/a Shady Grove Saloon. That instruction informed the jury that the verdict must be for plaintiff and against Ronald Ziehl, if the jury believed

that Overton was an employee and was acting as a doorman within the scope and course of his employment and intentionally struck or stabbed plaintiff. The instruction followed MAI 3d 13.02 and defined acts within the "scope and course of employment." Acts were within the scope and course of employment, even though not specifically authorized if they were (1) done to further the business of Ronald Ziehl under the general authority and direction of Ziehl and (2) they naturally arose from the performance of Overton's work.

Appellant Ziehl offered Instruction No. 13 which was refused, which would have informed the jury of the meaning of the scope and course of employment. That instruction would have informed the jury that acts of an employee which are outrageous and criminal, that is, so excessively violent as to be totally without reason or responsibility, are not within the "scope and course of employment."

Instruction No. 12 which was given informed the jury that if it believed that the conduct of the defendants, Overton and Ziehl, was willful, wanton or malicious, then in addition to actual damages, the jury may award punitive damages. Instruction No. 3, based on MAI 16.01, informed the jury that the term "malicious" does not mean hatred, spite, or ill will, as commonly understood, but means the doing of a wrongful act intentionally without just cause or excuse.

The jury unanimously awarded plaintiff, Noah, $4,000 actual damages against Overton and Ziehl, and assessed $1,500 punitive damages against Overton and $10,000 punitive damages against Ronald Ziehl, d/b/a Shady Grove Saloon.

After a separate motion for judgment notwithstanding the verdict or in the alternative, a motion for new trial was overruled, appellant, Ronald Ziehl appealed.

## II.

On appeal, appellant Ziehl contends that the judgment should be reversed or re-versed and remanded for a new trial. He contends that the trial court erred in failing to set aside the verdict and in denying his motions for a directed verdict at the close of the plaintiff's evidence and his motion for judgment notwithstanding the verdict for the reasons that (1) the conduct of Overton was so "outrageous and criminal" and beyond his course of employment, that, as a matter of law, the conduct was not within the scope of employment; and (2) there was no evidence that any conduct of Ziehl was willful, wanton or malicious, or that he directed, instigated or encouraged or ratified the conduct of Overton so that the $10,000 punitive damages cannot be imposed upon him on the basis of vicarious liability. He also seeks a new trial contending that the court erred (1) in giving Instruction No. 3, because that instruction was based on the standard of "malice in law" which is not sufficient to warrant the imposition of punitive damages in an assault and battery case, and (2) in giving Instruction No. 8 and refusing Instruction 13 offered by him which would have informed the jury about "outrageous" and "criminal" conduct.

## III.

At the outset it must be noted that this is not a case of negligent hiring, or a case of retention of an employee where the employer knew or should have known of the employee's dangerous proclivities. *See Gaines v. Monsanto Co.*, 655 S.W.2d 568 (Mo.App.1983). The petition did not plead negligent hiring and the cause was not tried on that theory. The cause was pleaded and tried on the theory of *respondeat superior*.

The general principles relating to employer and employee or "master and servant" have often been stated. The general principles are easily enunciated, but the application of the principles are difficult to apply in specific factual patterns. The legal result and the application of the general principles depend upon the facts and circumstances of each particular case and

no single test is conclusive. *See Sharp v. W. & W. Trucking Co.*, 421 S.W.2d 213, 220 (Mo. banc 1967); *annot., Assault by Servant*, 34 A.L.R.2d 372, 396 (1954); *see* Comment, *Employer Liability for Assaults by Employees*, 48 Mo.L.Rev. 655, 656 (1983).

■ Whether an employee is engaged in the scope and course of his employment is not measured by the time or motive of the conduct, but whether it was done by virtue of the employment and in furtherance of the business or "interests" of the employer. If the employee is actually engaged in and about the employer's business and is carrying out these purposes, the employer is held responsible under the doctrine of *respondeat superior.*[2] *See* Note, 39 Mo.L. Rev. 626, 627 (1974) and cases cited therein; *Cf.,* Comment, *supra,* 48 Mo.L.Rev. 655.

■ Under these principles, an employer is held liable to a third person for a tort, even though not directed or commanded nor expressly authorized by the employer, provided that the employee or agent has committed such act while engaged in the activity falling within the scope of his authority or employment. *Bass v. Kansas City Journal Post Co.*, 347 Mo. 681, 148 S.W.2d 548, 551 (1941). If the act is fairly and naturally incident to the employer's business although mistakenly or ill advisedly done, and did not arise wholly from some external, independent or personal motive, it is done while engaged in the employer's business. *Bova v. St. Louis Public Service Company*, 316 S.W.2d 140 (Mo.App. 1958).

■ The Missouri Approved Instructions, 3d 13.02 defines the phrase "scope and course of employment" as acts (1) which, even though not specifically authorized are done to further the business or interests of the employer under his "general authority and direction" and (2) which naturally arise from the performance of the employee's work. MAI 3d 13.02 (1981). The second requirement of MAI 3d 13.02, by its use of the word "naturally," implies that the employees' conduct must be usual, customary and expected. This amounts to a requirement of foreseeability. *See supra,* Note 39 Mo.L.Rev. at 630.

The Restatement (Second) of Agency § 228 (1957) provides (1) that when force is used, the conduct of an employee is within the scope of employment, only if the force is expectable by the master and (2) conduct is not within the scope if it is different in kind from that authorized or far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

The Missouri Supreme Court adopted § 231, Comment (a) of the Restatement (Second) of Agency in *Wellman v. Pacer Oil Co., supra,* 504 S.W.2d 55. Section 231 of the Restatement says that "the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result." Restatement (Second) of Agency, § 231 Comment (a) (1957).

■ The fact that an employee uses physical force not expressly authorized by his employer does not *per se* exonerate the employer. Restatement (Second) of Agency, § 245. Whether or not an employee's use of force is within the scope of his

---

**2.** *See Haehl v. Wabash Railway Co.*, 119 Mo. 325, 24 S.W. 737 (1893) referred to a leading case in MAI 3d, 13.02, Comment; *ovrl'd.,* as to certain language in *Wellman v. Pacer Oil Co.,* 504 S.W.2d 55 (Mo.1973). Professor Mechem stated the principle as follows: "The utmost that can be said is that an [employee] is acting in the course of his employment when he is engaged in doing for his [employer] either an act consciously and specifically directed or any act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act, or a natural, direct and logical result of it. If in doing such an act, the [employee] acts [wrongly] that is within the course of employment." 2 Mechem, *Agency,* § 1879 at 1461 (1914). *See also, Smothers v. Welch & Co. House Furnishing Co.,* 310 Mo. 144, 274 S.W. 678, 679 A.L.R. 1209 (1925). The test utilized in *Smothers* is as follows: "The fact that the act was done during the time of the servant's employment is not conclusive, nor is the motive of the servant so. The question is: Was the act done by virtue of the employment and in furtherance of the master's business."

employment is dependent upon many factors. *Annot.*, 34 A.L.R.2d 372, *supra;* Restatement, *supra*, §§ 228 and 229. Of primary importance are the nature of the principal's business, whether or not the employment will bring the employee into contact with the public and the likelihood that the employment will involve the use of force and whether or not the employee acts from a personal motive. *Henderson v. Laclede Radio, Inc.*, 506 S.W.2d 434 (Mo. 1974); *Smith v. Lannert*, 429 S.W.2d 8 (Mo.App.1968); *Thompson v. Portland Hotel Co.*, 209 Mo.App. 476, 239 S.W. 1090 (1922); *Mansfield v. Smithie, supra*, 615 S.W.2d 649.

In *Wellman v. Pacer Oil Company, supra*, our Supreme Court held that an employer was not responsible for the personal act of a gas station attendant who shot a customer. After a jury verdict in favor of the plaintiff for actual and punitive damages, the employer appealed. The sole question on appeal was whether the trial court erred in overruling the motion for a directed verdict because the employee's acts in shooting plaintiff were not within the scope and course of his employment. The Supreme Court concluded that the actions of the employee were so outrageous and criminal—so excessively violent as to be totally without reason or responsibility —and hence "must be said, as a matter of law, not to be within the scope of his employment." *Wellman, supra*, 504 S.W.2d at 58.

*Wellman* specifically overruled certain language in *Haehl, supra*, and *Panjwani v. Star Service & Petr. Co.*, 395 S.W.2d 129 (Mo.1965) to the extent that those cases disregard the maliciousness and criminality of the employee's conduct in determining whether the plaintiff's case is submissible. *See* Note, 39 Mo.L.Rev., *supra* at 628.

Similarly, in *Henderson v. Laclede Radio, Inc., supra*, 506 S.W.2d 434, the Supreme Court held that a salesman for a radio station committed an outrageous and unforeseeable act when he made an unprovoked attack on plaintiff and kicked plaintiff's leg with sufficient force to fracture a bone, when trying to collect a bill. The court relied on Restatement (Second) of Agency, § 245 relating to the use of force to hold that the conduct was beyond the scope of employment.

In *Mansfield v. Smithie, supra*, 615 S.W.2d 649, the proprietors of a nightclub were held vicariously liable for the conduct of their employee when the employee assaulted a patron with brass knuckles. The Western District held that the nature of the business brought the person into contact with the public and his use of force was not unlikely. The conduct was done within the hours of employment at the authorized place of employment and in furtherance of the business. The jury could conclude that the person was not acting from a personal motive but for the interests of the business; hence the court could not conclude as a matter of law the conduct was so outrageous as to fall within *Wellman*.

The doctrines in *Wellman* and *Henderson, supra*, although framed in terms of outrageous conduct or unexpected results, are part and parcel of the principle that when conduct of an employee exceeds the scope and course of employment and are done, not in furtherance of the employer's business, but to gratify the employee's feelings or resentment or revenge, the conduct is outside the scope and course of the employment. Several Missouri decisions hold, as a matter of law, where an employee acts outside the scope and course of his employment, the employer is not vicariously liable. *Smothers v. Welch & Co. House Furnishing Co., supra*, 274 S.W. 678; *Porter v. Thompson*, 357 Mo. 31, 206 S.W. 2d 509 (1947); *State ex rel. Gosselin v. Trimble*, 328 Mo. 760, 41 S.W.2d 801 (1931); *Milazzo v. Kansas City Gas Co.*, 180 S.W. 2d 1 (Mo.1944); *Rohrmoser v. Household Finance Corp.*, 231 Mo.App. 1188, 86 S.W. 2d 103 (1935); *Tockstein v. P.J. Hamill Transfer Co.*, 291 S.W.2d 624 (Mo.App. 1956) (truck driver who gave in to his feelings and who was provoked and angered

assaulted customer; assault was not intended to promote master's business).

■ Under these authorities we conclude that, based upon the facts in this record, Overton exceeded the scope and course of his employment and that the trial court erred in overruling appellant's motion for a directed verdict.

The fact that we deal here with a liquor establishment and the appellant operated a "saloon" and Overton was a "doorman" or "bouncer" does not, under the facts here, affect our conclusion. It is true that the nature of the business—a saloon, and the nature of the duties of a "bouncer" often affect the vicarious liability of the employer, and there are many decisions so holding. The operation of a liquor business is closely regulated by our law and in the operation of such business much leeway must be given to those employees who guard, check the door or act as a "bouncer" in such establishments. Such employees come into contact with the patrons; such employee's duties often entail the use of force to quell any disturbance or riotous or offensive conduct by those patrons who may consume too much. By the nature of the business and the nature of the employment, an employer cannot object if his employee vigorously acts in furtherance of his employer's business. Whether specific instructions are given or no authority is expressed by the employer, a "doorman," "guard," "bouncer," or other such employee may well bind the employer vicariously when, in furtherance of the employer's business he exceeds certain proprieties. As Professor Mechem states, if one is employed as a bouncer in a saloon, it is to be expected that one will use such means as are necessary to bounce an unruly customer. It is a job calling more for force than finesse; if a jury finds that more force was used than the situation quite warranted, and so a tort was committed, it seems neither unlikely nor unreasonable that such a happening will be considered one of the risks of the saloon business and that the tort, though useful, will be treated as committed in the course of employment. F. Mechem, *Outlines of Agency*, § 396 at 266–267 (4th ed. 1952); *Stewart v. Reutler*, 32 Cal.App.2d 195, 89 P.2d 402 (1939); *Chuck's Bar v. Wallace*, 198 Okl. 152, 176 P.2d 484 (1946). There are numerous decisions so holding. *See* cases collected in 34 A.L.R.2d, *supra* at 415. But in all these decisions the employee's conduct was in furtherance of the employer's business.

But, under the facts here, we believe that Overton's conduct in assaulting Noah exceeded the scope and course of his employment to make Ziehl vicariously liable. The evidence shows that as Noah was attempting to leave Shady Grove, Overton's girlfriend stood in front of Noah. Noah said he had to leave and "patted" her. Noah said Overton grabbed him, they struggled outside, Overton tried to gouge his eyes out, struck his head on a brick wall, Overton jumped on him with a knife and there is evidence that he stabbed him twice. This conduct occurred outside the confines of the tavern. It may well have been a part of Overton's scope and course of employment to forcibly remove Noah from the saloon and to use all reasonable force to prevent any further disturbance or harassment. But once the two men were outside the establishment; once the harassment had been removed, the conduct of Overton outside the tavern exceeded reasonable bounds and was excessively violent and not to be expected by his employer. Neither was such conduct at the time in furtherance of the employer's business. Overton admitted he sought "revenge," that he "lost complete control" and that he did some "pretty crude things" to Noah. Even under Overton's and Malin's scenario of the events, Overton's conduct exceeded reasonable bounds of the scope and course of employment. Respondent contends that since there was some evidence that Overton was authorized to drink liquor at the establishment, his conduct was foreseeable by Ziehl. But we believe the conduct here is such that it would not be foreseeable.

Our conclusion is supported by *Howard v. Zaney Bar*, 369 Pa. 155, 85 A.2d 401

(1952). There, the plaintiff, a patron in the defendant's bar was seriously wounded when shot by the bartender. The plaintiff had made advances to a girl and the bartender pulled out a gun and shot plaintiff. The court held that this conduct departed from the scope of employment. "Such a use of violence under these circumstances is shocking and a gross abuse of all authority the bartender possessed to maintain order." 85 A.2d at 402.

Therefore, tested by the above legal principles, we hold that the conduct of Overton exceeded the scope and course of his employment, in that his conduct was not, at the time in furtherance of his employer's business, so as to subject the appellant, Ziehl, to vicarious liability. We therefore reverse the judgment.

## IV.

Because we hold that the plaintiff, Noah, failed to make a submissible case against the employer, Ziehl, for the reason that the conduct of Overton, exceeded the scope and course of his employment, we need not discuss or examine the other issues or points raised by the appellant.

We reverse the judgment with directions to set aside the judgment of actual and punitive damages against the appellant, Ziehl, and to enter judgment in favor of the appellant.

The judgment is reversed with directions.

DOWD, P.J., and SIMON, J., concur.