945 F.2d 1422
 A. DOE, a minor, by B. DOE, her next friend; C. Doe, a
minor, by D. Doe, her next friend; E. Doe, a minor by H.
Doe, her next friend; I. Doe, a minor, by J. Doe, her next
friend; K. Doe; M. Doe, a minor by N. Doe, her next
friend; O. Doe; P. Doe; Q. Doe; R. Doe; S. Doe; T.
Doe; V. Doe; W. Doe, Appellees,
v.
B.P.S. GUARD SERVICES, INC. d/b/a Wells Fargo Guard
Services, Appellant.
 No. 90-2453.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 8, 1991.
Decided Oct. 3, 1991.
Rehearing and Rehearing En Banc
Denied Nov. 14, 1991.
 
 Gordon Ankney, argued (Edward Cohen, on brief), St. Louis, Mo., for appellant.
 Kim Roger Luther, argued (Katherine Butler, on brief), St. Louis, Mo., for appellees.
 Before LAY, Chief Judge, FRIEDMAN,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 B.P.S. Guard Services, Inc. appeals from judgments on jury verdicts in favor of twelve women who worked as models at a fashion show in the St. Louis Convention Center. Security guards employed by BPS used television surveillance cameras to watch and videotape the models as they changed their clothes in a makeshift dressing area. The models sued for invasion of privacy and recovered $1,000 each in actual damages and $35,000 each in punitive damages. On appeal, BPS argues that the evidence showed as a matter of law that the guards were acting solely for their own gratification and that BPS cannot be held responsible for the guards' acts under respondeat superior; that certain of the models did not show that they were taped in a state of undress and that they therefore did not establish the elements of invasion of privacy; and that the models' damages resulted from a superseding cause--the airing of the videotape by a local television station. BPS asserts a number of claims of trial error, including error in admission of evidence and in permitting misleading argumentation, as well as a generalized claim of jury confusion. BPS also argues that it should receive credits under Mo.Rev.Stat. section 510.263.4 (Cum.Supp.1990) against eleven of the punitive damages awards once it has paid one punitive award. Finally, BPS argues that the award of punitive damages against it violates its fourteenth amendment due process rights by placing standardless discretion in the hands of the jury. We affirm the district court's[1] judgment with respect to actual damages, but remand for further consideration of the two punitive damages issues.
 
 
 2
 The plaintiffs in this case were models in a "fitness fashion show," featured as part of a "Working Women's Survival Show" exhibition at the Convention Center. BPS, doing business as Wells Fargo Guard Services, had contracted with the City of St. Louis to provide guards at the Center.
 
 
 3
 There were a number of television surveillance cameras scattered around the Center which were monitored on small screens in a central control room. The direction the cameras were shooting in could be adjusted either manually or automatically in the control room. The control room also had a large screen that the guards could use to view the image from the cameras or to monitor what was being taped on the VCR. The purpose of having the VCR was to enable the guards to videotape suspicious activities. The Wells Fargo guards were told to practice taping on the VCR--"[i]f you had free time to experiment with it, learn how to use it" and to "learn how it works."
 
 
 4
 Promoters for the Working Women's Survival Show had a makeshift curtain dressing area set up near the stage for the models in the fashion shows in the exhibition. Unbeknown to the models, the dressing area was in a location that could be monitored by one of the surveillance cameras. That fortuity was discovered by two Wells Fargo guards, Rook and Smith. Rook had the rank of "Captain" within Wells Fargo, denoting supervisory capacity, though there was testimony that when he worked in the control room, he had no supervisory authority. There was evidence that someone had used the surveillance equipment to tape models changing clothes in the dressing area during the "Plaza Frontenac" fashion show the day before the plaintiffs' performance. Wells Fargo employee Capt. Ramey walked by the control room that night and saw the guards using the large screen to view women in a state of undress. Ramey (who also testified that he had no supervisory authority at the time in question) stated that he thought the guards were using the VCR to watch commercially made "funny"--or pornographic--tapes that they brought to work. There was testimony that the guards watched their own pornographic tapes in the control room. Rook testified that Tom Sonntag, a Wells Fargo guard, had once used the surveillance equipment to film models at a car show from above, aiming the camera down the womens' bosoms.
 
 
 5
 On Sunday, February 21, 1988, Smith or Rook (each accuses the other) focussed the camera on the plaintiffs and taped them as they were changing clothes for the fashion show. When Tom Sonntag became aware of the voyeuristic taping, he took the tape home, leaving a decoy in its place. Later in the week, Ramey reported the incident he had seen to Mrs. Perry, the wife of Wells Fargo's supervisor for the Convention Center, Major John Perry. Maj. Perry investigated the report, but found only the decoy tape in the control room. Sonntag decided to report the incident to Wells Fargo management. He phoned Wells Fargo and asked for a particular individual at Wells Fargo to accompany him to the police station to give the tape to the police. Wells Fargo management insisted instead that Sonntag turn the tape over to Wells Fargo and told him he would be in "really big trouble" if he refused to turn the tape over and that "three or four guys" were coming to his house to get the tape. Sonntag then said he was going to take the tape to the police. However, once at the police station, he saw a Wells Fargo car with men in it outside the station. Frightened, he noticed that a local television anchorman was also outside the police station; he gave the tape to the anchorman, who aired a redacted version of it on the local television news.
 
 I.
 
 6
 BPS first argues that the evidence showed that Rook and Smith were motivated solely by their own gratification in making the tape and that therefore they acted outside the scope of their employment as a matter of law. The standard of review on appeal from a jury verdict is quite stringent. We must view the evidence, together with all reasonable inferences, in the light most favorable to the Does. Dace v. ACF Indus., Inc., 722 F.2d 374, 375 (8th Cir.1983) (quoting Giordano v. Lee, 434 F.2d 1227, 1231 (8th Cir.1970), cert. denied, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971)), on reh'g, 728 F.2d 976 (8th Cir.1984) (per curiam). We may reverse only if:
 
 
 7
 "[A]ll of the evidence points one way and is susceptible of no reasonable inferences sustaining the position" of [plaintiffs]. Furthermore, we must resolve direct factual conflicts in favor of [plaintiffs], assume as true all facts in [plaintiffs'] favor which the evidence tends to prove, and give [plaintiffs] the benefit of all reasonable inferences.
 
 
 8
 Robertson Oil Co. v. Phillips Petroleum Co., 871 F.2d 1368, 1371 (8th Cir.1989) (citations omitted).
 
 
 9
 BPS cannot prevail under this standard, for the evidence is sufficient to allow the jury to find that the guard who did the taping was acting in some part in furtherance of Wells Fargo's business.
 
 
 10
 The substantive questions in this diversity case are governed by the law of Missouri. We review the district court's determination of state law de novo, giving district court rulings no deference in accordance with Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).
 
 
 11
 Under Missouri law, there can be no respondeat superior liability if the employee was acting entirely for his own purposes:
 
 
 12
 "The principle of respondeat superior applies only when what is complained of was done in the course of employment. The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in and about his business, and carrying out his purposes.... But if [the employer's] business is done, or is taking care of itself, and his servant, not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling[s] ... commits an [act] ... that has and can have no tendency to promote any purpose in which the principal is interested ... then the wrong is the purely personal wrong of the servant, for which he, and he alone, is responsible."
 
 
 13
 Haehl v. Wabash R. Co., 119 Mo. 325, 24 S.W. 737, 740 (1893) (emphasis added), quoted in MAI 3d 13.02 (Committee's Comment (1975 New)) and overruled on other grounds, Wellman v. Pacer Oil Co., 504 S.W.2d 55 (Mo.), cert. denied, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974).
 
 
 14
 On the other hand, a servant may act within the scope of his employment even though pursuing his own ends, if he is at the same time doing his master's business. Restatement (Second) of Agency makes this distinction in sections 235 and 236. Under section 235, "An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." Under Section 236, "Conduct may be within the scope of employment, although done in part to serve the purposes of the servant...." (emphasis added). In fact the servant's predominant motive may be to benefit himself, id. at comment b, but there can be respondeat superior as long as "the master's business actuates the servant to any appreciable extent." Id. See Foster v. Campbell, 355 Mo. 349, 196 S.W.2d 147, 150 (1946) (citing same principle from the first Restatement of Agency). As an evidentiary matter, there is an inference that if a "servant does the very act directed, or does the kind of act which he is authorized to perform within working hours and at an authorized place," he is acting within the scope of employment. Section 235, comment a.
 
 
 15
 The fact that the employee was doing the very act directed by the employer was enough to send the respondeat superior claim to the jury in Linam v. Murphy, 360 Mo. 1140, 232 S.W.2d 937 (1950). In Linam the Missouri Supreme Court reversed a district court that refused to submit a respondeat superior claim to the jury in a mixed motive case, though it was very clear in that case that the employee was pursuing his enjoyment to a very substantial degree. In Linam a flight instructor took control of the plane from the student and began "buzzing" features of the landscape below, apparently for his own amusement. The student asked him to stop, but the instructor persisted until he wrecked the plane and injured the student. The student sued the instructor's employer, and the trial court directed a verdict for the employer. The Missouri Supreme Court held that there was a submissible case that the instructor acted within the scope of his employment. The court focussed on the fact that the activities were of the same type the instructor was hired to perform:
 
 
 16
 "In taking over the controls he was acting within the scope of his employment, no matter what his motive may have been.... In our opinion it was impossible for [the instructor] to have 'deviated' from or gone without the scope of his employment from the time the plane took off from the Joplin airport.... It does not suffice to say that [the instructor] took the controls for the purpose of 'going on a frolic of his own' and then 'did the buzzing' for his personal enjoyment. His motive is not material if he was still engaged in defendants' business...."
 
 
 17
 232 S.W.2d at 941-42. The court said that if the buzzing was done as part of the master's business "as well as for fun," it could give rise to vicarious liability. Id. at 942.
 
 
 18
 In this case the guards were doing what their employer had told them to do--practicing taping with the VCR. There was even evidence that persons having supervisory rank were aware of the particular way in which the guards were practicing with the VCR the night before the events in question. The Does, having prevailed before the jury, are entitled to have the evidence and all reasonable inferences viewed in the light most favorable to them. Thus viewed, the jury could conclude that since these guards were engaged in exactly the type of activity their employer had bade them to do, they were furthering their employer's business at the same time they were pursuing their own gratification. Under Missouri law, that is all that is necessary to uphold the verdict.
 
 
 19
 BPS relies on Noah v. Ziehl, 759 S.W.2d 905 (Mo.Ct.App.1988), a Missouri Court of Appeals case in which a saloon "bouncer" threw a patron out of the saloon, and once outside, savagely attacked him. The Noah case held that the bouncer was not acting to further his employer's business, because once the patron was outside, it was not part of the bouncer's job to follow him out and beat him up on the street. In Noah the bouncer was not engaged in an act that could be simultaneously serving his master's business and his own; therefore, the patron was not entitled to the inference available to the plaintiffs in this case.
 
 
 20
 BPS also argues that the acts of the guards were outside the scope of employment as a matter of law under the "outrageous acts" doctrine of Wellman v. Pacer Oil Co., 504 S.W.2d 55 (Mo.) (en banc), cert. denied, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974). Jury Instruction No. 14[2] instructed the jury that it could award punitive damages if the defendant's conduct was "outrageous," and the jury did award punitive damages. Therefore, BPS argues that this finding of outrageous conduct is the legal equivalent of a finding that the guards' acts were outside the scope of employment.
 
 
 21
 Under Wellman, an act is deemed to be outside the scope of employment if it is so outrageous "as to be totally without reason or responsibility." 504 S.W.2d at 58. The outrageous act doctrine imposes a foreseeability standard in respondeat superior cases, see Henderson v. LaClede Radio, Inc., 506 S.W.2d 434, 437 (Mo.1974), which we are not prepared to say is identical with the test for permitting the award of punitive damages under Missouri law. Therefore, we reject BPS' argument that the jury's finding that the guards acted within the scope of their employment is legally inconsistent with the award of punitive damages.
 
 II.
 
 22
 BPS next argues that certain plaintiffs had no cause of action for invasion of privacy because there was no evidence that they were videotaped in any state of undress. So long as there was an objectionable intrusion into the plaintiffs' enjoyment of an area in which the plaintiffs had a right and expectation of privacy, it is not necessary to the plaintiffs' cause of action that they be viewed in a state of undress. See generally Corcoran v. Southwestern Bell Tel. Co., 572 S.W.2d 212, 215 (Mo.Ct.App.1978). This case is easily distinguishable from Cox Communications, Inc. v. Lowe, 173 Ga.App. 812, 328 S.E.2d 384, cert. denied, 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985), cited by BPS, in which a prisoner was photographed walking in a prison yard, which was visible from a public place and in which there was no reasonable expectation of privacy. BPS also relies on Moffett v. Gene B. Glick Co., 621 F.Supp. 244, 284 (N.D.Ind.1985), which involved the ransacking of an employee's desk at work, presumably by her employer. We do not perceive these facts to be analogous to this case of invasion by strangers into a private dressing area. There was sufficient evidence to support the invasion of privacy claim.
 
 III.
 
 23
 BPS also argues that the actual damages proved at trial were not legally caused by BPS, but by the television station that aired the redacted version of the videotape.
 
 
 24
 The evidence concerning the various plaintiffs' emotional response to the television showing of the videotape was received without any objection by BPS, and we do not understand BPS to argue that the district court erred in admitting the testimony.[3] Though BPS objected to the particular damages instruction given, it did not argue that the court could not instruct on actual damages at all, and in fact BPS submitted an alternative actual damages instruction. BPS' counsel specifically declined to submit a nominal damages instruction. Neither did BPS ask for any instruction requiring the jury to separate damages resulting from the guards' taping from damages resulting from the television airing of the tape. BPS does not argue on appeal that plaintiffs suffered no damages other than those resulting from the television airing of the tape. Therefore, in light of BPS' failure to request an instruction differentiating damages from its acts and damages from superseding acts, there is no district court ruling improperly denying BPS anything it asked for in this regard.
 
 IV.
 
 25
 BPS argues that the district court made various trial errors. First, it argues that the district court erred in admitting a statement by Rook that Smith told him he was going to copy the videotapes. Second, it argues that a videotape exhibit showing the Plaza Frontenac models was not properly authenticated. Decisions concerning admission of evidence rest in the sound discretion of the district court. Robertson Oil Co. v. Phillips Petroleum Co., 930 F.2d 1342, 1346 (8th Cir.1991). We have examined the record and we see no abuse of discretion in the evidentiary rulings BPS challenges.
 
 
 26
 BPS argues that the district court erred in permitting several instances of improper argument in plaintiffs' closing argument. Control of the arguments of counsel is entrusted to the district court's discretion. Griffin v. Hilke, 804 F.2d 1052, 1057 (8th Cir.1986), cert. denied, 482 U.S. 914, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987). Again, we have reviewed the record and we do not deem the rulings complained of to be an abuse of that discretion.
 
 
 27
 BPS also argues that the verdict should be set aside because the jury was confused; without touching on the myriad of possible responses to this argument, we simply state that BPS did not point to any persuasive reason to believe that the verdict was compromised by confusion on the part of the jury.
 
 V.
 
 28
 Finally, BPS argues that the award of punitive damages violates its due process rights and should be reversed under Pacific Mutual Life Insurance Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). This case was, of course, tried before Haslip was handed down. At the instruction conference BPS neither objected to the punitive damages instructions on fourteenth amendment grounds nor submitted any alternative instruction; therefore, under Robertson v. Phillips Oil, 930 F.2d at 1347, BPS waived any defect in the instruction. However, as in Robertson, id. BPS' post trial motion for remittitur raised the issue squarely and was denied summarily. Therefore, under Robertson, the case should be remanded for consideration of the post trial motion in light of Haslip and controlling Missouri authority. The district court should, at the same time, consider the applicability of Mo.Rev.Stat. section 510.263 and its effect, if any, on the punitive damages awards.
 
 
 29
 We affirm the judgment of the district court as to the actual damages awards and remand it for further review of the punitive damages awards.
 
 
 
 *
 The HONORABLE DANIEL M. FRIEDMAN, Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 INSTRUCTION NO. 14:
 If you find the issues in favor of plaintiffs, and if you believe the conduct of defendant as submitted in these Instructions was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiffs entitled in these Instructions, you may award plaintiffs an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct.
 
 
 [3]
 BPS points out that it moved in limine to exclude evidence of "news or media coverage resulting from the showing of the KTVI videotape on KTVI's news broadcast" and that the district court denied its motion. This language does not seem to refer to the initial television airing, but to the follow-up media coverage that occurred in newspapers and on the radio. In any case, the motion in limine did not preserve the issue in light of BPS' failure to object at trial, see United States v. Roenigk, 810 F.2d 809, 815 (8th Cir.1987), and the issue does not rise to the level of plain error